(78 Misc. Rep. 203.)

SOMERVILLE et al. v. CITY OF NEW YORK et al.

(Supreme Court, Special Term, Kings County.   November 1, 1912.)

1. ESTOPPEL (§ 90*)—ADMINISTRATIVE PROCEEDINGS—TAXATION.

The city of New York, by treating certain land under Gravesend Bay as belonging to persons deriving title from the state and taxing it accordingly, did not estop itself from claiming the land under the bay as belonging to the city.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 242–244, 248–256; Dec. Dig. § 90.*]

2. NAVIGABLE WATERS (§ 37*)—LAND UNDER WATER—GRANTS—CONSTRUCTION.

On December 16, 1645, Gov. Kieft granted to Lady Deborah Moody and others land which subsequently became the township of Gravesend, described as "a Certaine quantitie or parcel of land, together with all ye havens, * * * creekes, * * * marshes and all other appurtenances thereunto belonging, lyeing and being uppon and about ye Weastermost parte of Longe Island, and begining att ye mouth of a Creek adjacent to Coneyne Island and being bounded on ye Westward parte thereof with ye land appertaining to Anthony Johnsonn and Robert Pennoyre and soe to runn as farre as the westermost parte of a Certaine pond in an ould Indian field." After years of dispute and litigation as to the boundaries of the town of Gravesend, it received on July 1, 1670, a confirmatory grant from Gov. Lovelace, which granted certain land, "together with the Inheritance of all Couney Island, * * * including all the land within a lyne stretching from the westermost parte of the said Island unto the southermost parte of Anthony Jansens old Bowerye their east bounds being the Strome Kill which comes to the Marsh or fflye of Mathew Gerretsons land, * * * as also the meadow ground and upland not specified in their former Patient concerning wch there have been severall disputes and differences betweene the Inhabitants of the said Towne and their neighbour, * * * With all havens harbours * * * waters * * * fishing * * * and all other * * * hereditaments to the said Towns Tract of Land Island and premises within the lymitts & bounds aforementioned." Held, that the several grants gave to the town title to the land under Gravesend Bay between a straight line running in a northeasterly direction from the westerly point of Coney Island to the southermost part of Anthony Jansen's land.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

3. BOUNDARIES (§ 33*)—CONSTRUCTION—STRAIGHT LINES.

A line described in a deed as running from one monument to another is presumed to be a straight line, in absence of other description.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 146–152; Dec. Dig. § 33.*]

4. WATERS AND WATER COURSES (§ 93*)—BOUNDARIES—MONUMENTS—MOVEMENT BY ACCRETION.

A monument or call cannot be moved by accretion, though title to the land formed may be.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 96–103, 106, 107; Dec. Dig. § 93.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. EVIDENCE (§ 67*)—JUDICIAL NOTICE.

While it may be common knowledge that the shores of Gravesend Bay near the former town of Gravesend and Coney Island have shifted materially within the memory of man and within the last 200 years, in absence of contrary proof it must be assumed that the present existing physical conditions are as they always were.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 87, 88, 103; Dec. Dig. § 67.*]

6. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—TITLE—EVIDENCE.

In a suit to restrain New York City from interfering with the erection of a bulkhead on land under Gravesend Bay, involving whether the land under the bay belonged to the state or to New York City, evidence *held* to show that, from 1686 until the merger of the town of Gravesend with the city of Brooklyn, the town claimed the rights in the bay and exercised ownership over parts of it.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

7. ESTOPPEL (§ 93*)—AGAINST MUNICIPALITY—ADMINISTRATIVE PROCEEDINGS.

The opening and grading of an avenue, and placing of property upon the assessment roll and tax maps, and acquiescing in improvements upon land under the waters of Gravesend Bay, which was obtained by state grants, would not estop New York City and its grantees from claiming the land under Gravesend Bay as belonging to the city, and not to the state.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 264–275; Dec. Dig. § 93.*]

Action by Edward L. Somerville and another against the City of New York and Calvin Tomkins, as Commissioner of Docks of the City of New York. Judgment for defendants.

Somerville & Somerville, of Brooklyn, for plaintiffs.

Archibald R. Watson, of New York City, Corp. Counsel, for defendants.

CRANE, J. While this action is brought to restrain the city of New York and the commissioner of docks of said city from interfering with the erection and construction of a bulkhead by the plaintiffs on their land under water, it is really an action to determine whether the land under water in Gravesend Bay belongs to the state of New York or to the city of New York as the successor to the town of Gravesend. Gravesend Bay is formed by a neck of land running out on the south known as Coney Island, and bounded on the east and north by Gravesend and New Utrecht. It is by no means a land-locked harbor or bay, but is part of New York Harbor or Bay, curving to the southeast into the mainland, and protected from the ocean on the south by this Coney Island neck. The claim of the town to that part of the bay surrounded on the three sides by the township lands, which include Coney Island, is based entirely upon colonial grants and the acts of user thereunder.

The importance of this question is at once apparent when it is stated that, beginning with 1897, the state of New York has made numerous grants of land under water in Gravesend Bay adjoining

the north shore of Coney Island, and that these lands have been filled in and improved into streets and building sites. A portion of what is known as Sea Gate has been developed upon land thus filled in.

[1] While the city of New York has treated this property as belonging to the persons deriving title from the state, and has assessed and taxed it accordingly, yet this does not create such an estoppel as to prevent the city from now making claim of ownership. McFarlane v. Kerr, 10 Bosw. 249; Consolidated Ice Co. v. City of New York, 166 N. Y. 92–101, 59 N. E. 713. It is therefore necessary to refer to these ancient patents to ascertain whether the town of Gravesend received by grant the land under water in Gravesend Bay.

[2] The Lovelace patent of July 1, 1670, and the Dongan patent of 1686, upon which the claim of the town is chiefly based, are better understood in the light of previous grants and litigations. Following Gov. Kieft's patent to Anthony Jansen in 1643, and a grant to Robert Penoyer on November 29, 1645, both covering property to the north and west of that claimed by Gravesend, the same governor on December 16, 1645, granted to Lady Deborah Moody and other patentees land which subsequently became the township of Gravesend. The description therein pertinent to this inquiry is as follows:

"A Certaine quantitie or parcel of land, together with all ye havens, harbours, rivers, Creekes, woodland, marshes and all other appurtenances thereunto belonging, lyeing and being uppon and about ye Weastermost parte of Longe Island, and begining att ye mouth of a Creek adjacent to Coneyne Island and being bounded on ye Westward parte thereof with ye land appertaining to Anthony Johnsonn and Robert Pennoyre and soe to runn as farre as the westermost parte of a Certaine pond in an ould Indian field," etc.

Passing by the Indian deeds, which are so uncertain in terminology and description as to be of little value, we come to the Nicoll patent to the town of Gravesend in 1668, a confirmation of the Kieft patent; the description pertinent being the same as above quoted. Between the grantee of the adjoining land, Anthony Jansen, and the town of Gravesend, there arose a dispute as to a neck of land lying between Mill creek and Gravesend Bay and forming part of the easterly shore of that bay. This dispute resulted in a petition to the Director General and Council of New Netherlands, who in June, 1656, proceeded to Gravesend to inspect the property and settle boundaries. This was followed in a few days by a judgment of the Director General and Council of the New Netherlands declaring that the patent of Gravesend begins at the kill or creek next to Coney Island, and not at the middle of the bay, and stretches thence, not along the shore of the bay, but to the point where the land of Anthony Jansen and Robert Penoyer join each other; that is, that the line of Gravesend patent ran along Mill creek, and not along the shore of the bay.

No doubt much of this dispute between Jansen and the town of Gravesend was due to the uncertainty in fixing the starting point

of the latter's grants. It will be noticed that the Kieft and Nicoll patents read:

"Begining att ye mouth of a Creek adjacent to Coneyne Island."

Where this creek was cannot now be determined, and is not shown upon any of the early maps. The map of the town of Gravesend (Defendant's Exhibit JJ) shows only Mill creek; the map of 1788 (Exhibit II) shows two creeks south of Mill creek; while Plaintiff's Exhibit 23 shows a different formation altogether. If the grants to the town of Gravesend rested here, it would be quite certain that no judgment could be given awarding the town land under water in Gravesend Bay, as it could not be determined where the starting point or creek adjoining Coney Island was located.

Evidently the judgment above referred to was not acquiesced in by the town, for Jansen again complained that his rights were being interfered with by the people of Gravesend, and a commission was appointed to examine into the boundary question, which resulted in an order being made directing the survey of Anthony Jansen's land and the drawing of a line from the mouth of the kill to the easternmost part of Anthony Jansen's line. This was not along the shore front, but inside and along the creek. Another judgment was given in council, dated August 29, 1656, determining the boundaries as theretofore settled and as above stated. Even then the dispute was not terminated, as in 1669 Francis Brown, Jansen's successor in title, and the inhabitants of Gravesend submitted their differences over the boundary to the governor, before whom it was claimed by the township that their western boundary in the grant from Gov. Kieft—

"begin at the mouth of a smale creeke on Coney Island whence a line being drawne north and by east to Anthony Janssen land it doth fully comprehend within it the meadow ground or valley in dispute."

In reply to this claim it was stated:

"Neither doth it fully appeare (if allowed) which is the Mouth of the Creeke upon Coney Island from whence their lines is to be stretched, other Creekes appearing, which may more probably bee given the denomination of Creeks, then that which they so much urge and if so then their pretensions by that westerly line are cutt of."

The decision upon this hearing was rendered on the 23d of August, 1669, to the effect that both parties should enjoy a portion of this neck or meadow in dispute, unless, thinking themselves aggrieved, they sue for redress at the next Court of Assizes. The parties resorted to litigation, where a verdict for Brown, the defendant in the suit, was set aside. Evidently intending to end all further questionings and litigations, the inhabitants of Gravesend and Francis Brown on the 29th day of April, 1670, entered into an agreement regarding this neck of land, running the town line up through the creek, but giving the inhabitants of the town the right to pass over the neck of land to reach the bay for fishing and fowling purposes.

A reading of these various proceedings and records convinces one that the town of Gravesend never acquiesced in any decision of commission, council, or governor that its westerly boundary did not include some portion of the bay, by reason of its line commencing at a creek on Coney Island and running to Jansen's land, and that, while they settled their dispute with Brown by giving him possession of the neck or meadow between Mill creek and the bay, yet they preserved their right or claim to the use of the bay, by reserving the right of egress and regress over said neck of land to reach the shore. After 25 years of dispute and litigation the town of Gravesend on July 1, 1670, the year in which it made its settlement with Brown, received from Gov. Lovelace a grant, not only confirmatory of all that had gone before, but also extending this line of western boundary with such definiteness as to preclude further questionings, and, in my judgment, to give the town title to the land under water in Gravesend Bay between a line running in a northeasterly direction from the westerly point of Coney Island to the southernmost part of Anthony Jansen's land. This grant, after reciting that there is a certain town in the West Riding of Yorkshire upon Long Island known as Gravesend, containing a certain quantity of land beginning at a certain creek adjacent to Coney Island and being bounded on the westernmost part by the land of Anthony Jansen and Robert Penoyer, for which there was theretofore a patent from the Dutch governor, William Kieft, together with all havens and harbors, confirms the said grant, and proceeds in the following words to extend and make more definite the boundaries:

"All this forementioned quantitye tract and parcell of Land sett forth and bounded as aforesaid *together with the Inheritance of all Couney Island* (reserving onely the privilege of erecting *Hutts* for fishing and dryeing of netts there upon occasion for all persons who shall undertake that designe for ye publique good) *including all the land within a lyne stretching from the westermost parte of the said Island unto the Southermost parte of Anthony Jansens old Bowerye their East bounds being the Strome Kill* which comes to the Marsh or ffiye of Mathew Gerretsons land aforementioned, as also the meadow ground and Upland not specified in their former Pattent concerning wch there have been severall disputes and differences betweene the Inhabitants of the said Towne and their neighbour Francis Browne the which in parte were issued both by my Predecessor and my selfe but since fully concluded and determyned betweene them by Articles of Agreement. the which Articles I doe hereby confirme and allowe, With all *havens harbours* Creeks Quarryes Woodland Plaines meadow ground pastures Marshes *waters* Lakes Ryvers *fishing* Hawking hunting and fowling and all other profitts Comodityes Emoluments and Hereditaments to the said Towns *Tract of Land Island and premisses within the lymitts & bounds aforementioned described belonging or in any wise apperteyning.*"

If there was any doubt as to where the creek adjoining Coney Island was, there could be no doubt as to the westernmost part of Coney Island; neither was there any uncertainty as to the southernmost part of Jansen's farm and the line stretching between these two definite points. It must have been intended to be a straight line, and not one following the curve of the shore.

[3] A line given in a deed as running from one monument to

another is, in the absence of further description, presumed to be a straight line. Kingsland v. Chittenden, 6 Lans. 15. Not only the previous difficulty which the town had had in attempting to fix its westerly boundary, but also the plain language of this grant, would show an intent to include the water and the land under water between this straight line thus drawn between these two points and the shore line to the east. The map of 1788, proved in litigation between Albert Voorhis and Albert Terhune (Defendants' Exhibit. II), shows very clearly how this line was drawn and the westerly boundary of the town as it then existed.

The Dongan patent, granted to the town of Gravesend in 1684, was but a confirmation of the Lovelace patent and all other previous grants, except that it extended the westerly boundary line from the westernmost part of Coney Island to the westernmost part of the land of Anthony Jansen. Although this extended the title of the town to the land under water, it could not affect the title to the Jansen farm, but did include this land within the township of Gravesend.

[4] It is said that the westernmost part of Coney Island has been a shifting point, gradually extending to the west into the ocean, and that a monument or call point cannot move by accretion, although title to the formed land may. This is true, and the title of the town of Gravesend to land under water can only extend from the end of Coney Island as it was at the time of the Dongan Charter, 1686.

[5] But, while it may be common knowledge that these shores have shifted very materially within the memory of man, and probably to considerable extent in the last 200 years, yet, in the absence of all proof upon this subject, I must assume that the present existing physical conditions are as they have always been.

The only exhibits having measurements which would indicate the location of the westerly point of Coney Island are Defendant's Exhibit II and Plaintiff's Exhibit 13a. According to the former, Coney Island point in 1788 was about 5,000 feet from the mouth of Mill creek. According to the latter, Coney Island point in 1882 was about 5,200 feet from the mouth of Coney Island creek, and lot 47, the plaintiff's parcel, about 2,800 feet therefrom. The evidence in this case does not show any substantial change of location of the westerly point of Coney Island. If Coney Island creek does not correspond with either of the creeks shown on the map of 1788, then there is no reliable evidence in this case to show that the westerly point of Coney Island is to-day located further west than in 1686.

The title of the town of Gravesend to the land under water in Gravesend Bay between the shore and the line drawn from the New Utrecht line (the westernmost part of the Jansen farm) to the westernmost part of Coney Island has been established by the grants and proceedings above referred to, and passed to the city of New York under the acts incorporating that territory into the Greater City.

[6] The acts of the inhabitants of the town of Gravesend have :always been consistent with this claim of title. Commencing with the year 1702, down to 1811, they made, at various times, regula-tions governing the fishing in Gravesend Bay, and fixing a tax on fishing nets used upon the hauls; also providing that every person taking clams with rakes from the creeks, bays, or harbors within the limits of the patent of said town should forfeit the sum of $5. In 1815 the town petitioned the state Legislature regarding the use of fishing nets, and therein stated that it possessed the exclusive right of shad fishery in Gravesend Bay, included in a line stretching from the point of Coney Island across the bay to the division line on the shore between Gravesend and New Utrecht. In 1843 the town adopted a resolution to defend Van Siclen and Hicks in an action brought against them involving the rights to the fishery in the bay and the use of the beach.

Application having been made in 1886 by the Prospect Park & Coney Island Company to acquire title to certain real estate in the town of Gravesend, commissioners were appointed, and an award made to the town of Gravesend, not only for the upland, but also for the shore to low-water mark. The award was con-firmed and paid to the town of Gravesend.

Neptune avenue between West Thirty-Sixth street and West Sixth street, was opened in 1886, pursuant to resolution of the Kings county board of supervisors. Between West Thirty-Sixth street and West Twenty-Third street, Neptune avenue consisted of land below high-water mark in Gravèsend Bay, along the north-erly shore of Coney Island. In this proceeding the report of the commissioners, filed in the Kings county clerk's office on May 7, 1886, mentions seven of the lots on each side of the newly opened street as owned by the town of Gravesend.

Twenty-four deeds in evidence show that since 1891 the town has conveyed away to various individuals the land under water on the northerly shore of the bay, and by leases made in 1858 and in 1862 disposed of a portion of the shore to low-water mark.

It will thus be seen that from 1686 until the merger with the city of Brooklyn the town of Gravesend claimed property rights in Gravesend Bay and exercised ownership over portions of it. In 1894, by chapter 449 of the Laws of that year, the town of Graves-end was annexed to the city of Brooklyn, and by chapter 378 of the Laws of 1897, known as the Greater New York Charter, the city of Brooklyn, including the town of Gravesend, was consoli-dated with the city of New York.

With but one exception, the state of New York made no attempt to exercise any rights in Gravesend Bay until 1897, the year of the consolidation of this territory with the city of New York. When all the town records of Gravesend were turned over to the city of Brooklyn, and a few years subsequently to the Greater City of New York, it can be well imagined that it would take the officials of the Greater City some little time to familiarize themselves with all the various colonial grants and proceedings affecting the vast

shore front bordering upon the bays, creeks, and ocean which had suddenly become part of the greater municipality. If for a few years thereafter more or less confusion existed, and the correct title to the various lots and parcels of land was not stated upon the tax books and assessment rolls, it will hardly cause surprise, but is rather to be expected. Thus the city has concededly for a number of years assessed and collected taxes upon land filled in below high-water line, for which grants were received from the state.

There have been a number of these grants made by the state of land under water off the north shore of Coney Island and in Gravesend Bay; but all of them, with one exception, have been made after the merger of the town of Gravesend and the city of Brooklyn into the city of New York. This one exception consists of an application made to the state for land under water in 1882 by the New York & Coney Island Railroad Company, and which, according to the record, received the approval by telegram of John Y. McKane, supervisor of the town of Gravesend. The property lay at the westerly extremity of Coney Island, and very possibly was considered as extending into New York Bay, instead of into Gravesend Bay, or else as being at a point beyond where the western extremity of Coney Island was at the time of the Dongan Charter. This may be gathered from the fact that the application described the land under water as being in New York Bay and Gravesend Bay. If in New York Bay, application was rightly made to the state. I do not consider, therefore, that this grant by the state in 1882 is any indication of a waiver upon the part of the town of any claim of ownership in the bay.

[7] Under certain conditions it might very well be that the city of New York or its predecessors in title would be estopped from making claim of ownership after inducing others to invest money in improvements upon representations that no such right existed; but the opening and grading of Neptune avenue, and the placing of the property upon the assessment roll and tax maps, and even acquiescing, without otherwise participating, in the improvements upon the land under water obtained by state grants, does not amount to such an estoppel as to pass the title of the city of New York to the plaintiffs and others.

The land involved in this suit, according to the evidence in this case, belonged to the town of Gravesend under the Lovelace and Dongan patents, passed to the city of New York, and the title has not been divested by waiver, or any acts amounting to an estoppel. Therefore the defendant was justified, through its dock commissioner, in preventing the plaintiffs from bulkheading and filling in upon the same.

Judgment for the defendants, with costs.