Second Department, October, 1921.                    [Vol. 198

ELLEN NEVINS, Appellant, Respondent; *v.* GUS FRIEDAUER and Another, Defendants, Impleaded with the CITY OF NEW YORK, Respondent, Appellant.

Second Department, October 21, 1921.

**Waters and watercourses — deed by town to lands below high-water mark in Gravesend bay did not pass title where description was not in proposition to sell which was voted on by electors — construction of avenue below high-water mark or filling in between said avenue and purchaser's land by tenant did not give title to purchaser — filling in land beyond avenue by third person did not give purchaser title in fee to that land.**

In 1889 the town of Gravesend, since become part of Greater New York, the owner of certain lands on Coney Island and lands under water in Gravesend bay, received a proposition to purchase old lot 44 on a map of the common lands of Coney Island belonging to the town. As required by statute (Laws of 1883, chap. 458) that proposition was submitted to the electors of the town with a definite description of the lot, which did not include any land under the water in Gravesend bay. The electors approved of the proposition and a deed was executed by the trustees of the town to plaintiff's predecessor in title which contained the same description as contained in the proposition submitted to the electors and purported further to convey " Together with all the right, title and interest of the party of the first part in and to the water and land under water in Gravesend bay adjacent to the said premises as far as the title of the party of the first part extends." *Held*, that the deed to the plaintiff's predecessor, in so far as it purported to convey lands under water in Gravesend bay, was invalid, since the proposition submitted to the electors did not include a description thereof, and he did not acquire any title to those lands.

The plaintiff did not acquire title in fee to the lands under water below high-water mark in front of her premises by the act of the town in constructing an avenue over lands under water in Gravesend bay beyond high-water mark and paralleling her boundary line on the bay, which was laid out and legally opened before plaintiff's predecessor acquired title, nor did the act of her tenant in filling in the bay between her boundary line and the avenue have the effect of giving her title in fee to that land.

Likewise, she did not acquire title in fee to the lands beyond said avenue on the theory of accretion, on the ground that said land under water was filled in by a contractor for the United States government without plaintiff's consent.

CROSS-APPEALS by the plaintiff, Ellen Nevins, and the defendant, the City of New York, from a judgment of the

Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 2d day of October, 1920, on the decision of the court rendered after a trial at the Kings Special Term.

The action was brought originally on the 23d day of June, 1919, against the defendants Friedauer and O'Neil. The said defendants, under a license from the commissioner of docks of the city of New York, had entered upon certain made land in Gravesend bay and constructed bungalows thereon. The plaintiff, claiming to own the land, brought this action in equity for an injunction on the theory of a continuing trespass. On the 12th day of March, 1920, on the application of the city of New York, an order was entered making the city a party defendant and authorizing it to appear and answer. The city of New York thereupon answered and denied the title of the plaintiff to the property upon which the individual defendants were constructing bungalows, asserting that it was the property of the city, and interposed a counterclaim asking that the deed made by the former town of Gravesend, the predecessor of the city, to the predecessor in title of the plaintiff, be adjudged void in so far as it purports to convey any land under the waters of Gravesend bay and that it be reformed by omitting therefrom the portion of the description purporting to include land under water in Gravesend bay, to which counterclaim the plaintiff replied.

The judgment of the court at Special Term decided that the deed from the town to plaintiff's predecessor in title conveyed no title to land under water in the bay, but that plaintiff as a riparian owner was entitled to the made land upon which the bungalows were erected and other made land described in the judgment, and owned the same in fee simple. The court refused to find that the plaintiff was the owner in fee simple of the land under water between the made land and the bulkhead line, and the judgment decrees that the city of New York is the owner of such land under water.

The defendant city appeals from the judgment, and the plaintiff appeals from so much thereof as decrees the city to be the owner of the land under water between the made land and the bulkhead line.

*William N. Dykman,* for the plaintiff.

*Charles J. Nehrbas [John P. O'Brien, Corporation Counsel,* with him on the brief], for the defendant City of New York.

KELLY, J.:

It has been decided by the Supreme Court at Special Term that the title to the land under water in Gravesend bay was vested in the city of New York under the ancient patents to the town of Gravesend, the predecessor in title of the city. (*Somerville* v. *City of New York,* 78 Misc. Rep. 203, opinion by CRANE, J.; *Somerville* v. *City of New York,* 89 id. 188; *Harway Improvement Co.* v. *City of New York,* 113 id. 788, opinion by LAZANSKY, J.) We agree with the conclusions of the Special Term in the cases cited, that the town of Gravesend was the owner in fee of the lands under water in the bay and that title to such land is now in the city of New York unless conveyed by the town or city.

Under the various patents referred to in the decisions cited, the upland which comprised the west end of Coney Island lying between the Atlantic ocean on the south and Gravesend bay on the north was also granted to the town of Gravesend. By chapter 458 of the Laws of 1883, amending Laws of 1880, chapter 92, section 3, the trustees of the town were forbidden to sell any of the lands of the town, with certain exceptions not material here, unless the proposition to purchase was submitted to the electors of the town at an election duly called; if the electors voted to sell the land, then authority was given the trustees to convey at the price bid. A " Map of the Common Lands on Coney Island belonging to the Town of Gravesend " was made by William Kowalski in 1878 and filed in the office of the town clerk. In 1885 another map was made by Kowalski and filed in the office of the register of the county of Kings entitled " Map showing Change of Lines of Certain Streets and Avenues on Coney Island in Town of Gravesend." The map of 1878 showed the upland divided into lots 300 feet in width, running north and south across Coney Island, bounded on the north by mean high-water mark on Gravesend bay and on the south by mean high-water mark on the Atlantic ocean. No streets or high-

ways were shown on the map of 1878. The map filed in 1885 showed the same lots as the original map, but with various streets and avenues laid out by the town survey commission constituted by Laws of 1869, chapter 670, as amended by Laws of 1872, chapter 331, and Laws of 1874, chapter 581, opened and to be opened. Two of these avenues were laid out on the map running east and west, north of the line of mean high water on Gravesend bay; Neptune avenue, approximately 400 feet north of said high-water line, being 80 feet in width, and Canal avenue, approximately 350 feet north of Neptune avenue, 100 feet in width.

In 1885 the town of Gravesend, owning the upland lots and the land under water in Gravesend bay, instituted proceedings to open certain of the streets and avenues shown on the town commissioner's map and upon the second Kowalski map of 1885, among others Neptune avenue. The board of supervisors of Kings county, acting pursuant to Laws of 1881, chapter 554,* directed application to the Supreme Court for the appointment of commissioners. (Supervisors' minutes, November 25, 1885, p. 866, resolution No. 5.) Commissioners were appointed, maps were made showing the land to be taken for Neptune avenue between the west line of lot 47 and West Sixth street, also an assessment area of land benefited by the opening north and south of the avenue. Hearings were had before the commissioners, and their report of awards for land taken and assessments for benefits was presented to the court at Special Term and confirmed by order entered May 7, 1886. (*Matter Opening Neptune Avenue.* Petition, report and order filed in county clerk's office " 1885 No. 2128 " with opening maps.) By this report, confirmed by the court, damages were awarded to the town of Gravesend, as owner, for the land taken for Neptune avenue, and an assessment for benefits was levied on the land of the town north and south of the avenue for benefit to said lands by reason of the opening. The land of the town over which Neptune avenue was so laid out was land under water in Gravesend bay.

On March 19, 1889, four years after the filing of the second

---

*Amdg. Laws of 1875, chap. 482, § 1, subd. 9, as amd. by Laws of 1880, chap. 365. — [REP.

Kowalski map and the institution of the proceedings to open Neptune avenue, and nearly three years after the confirmation of the report of the opening commissioners, the trustees received a proposition to purchase old lot 44, shown on the original map, for $6,500. The northerly boundary of old lot 44 as shown on that map was mean high-water line on Gravesend bay, but by the map filed in 1885 there were two highways laid out by the town survey commission across the bay north of the high-water line, Neptune avenue and Canal avenue, the former of which had been opened as stated. The proposition was submitted to the electors of the town at a meeting called in pursuance of the statute (Laws of 1883, chap. 458), who voted in favor of the sale, and the trustees thereupon executed and delivered to John Tracey a deed conveying old lot 44 by the following description:

"All that certain lot or plot of land situate in the Town of Gravesend, Kings County, New York, being Old Lot 44 of the Common Lands of said Town, as shown on the Map of said lands by William Kowalski, Surveyor, filed with the Clerk of said Town September 5, 1878, described as follows: Beginning at the Atlantic Ocean at the line of division between the lot hereby conveyed and Old Lot 43, as shown on said Map, thence running North along said line of division to Gravesend Bay, thence West along said Bay to the line of division between the lot hereby conveyed and Old Lot 45, as shown on said Map; thence south along said line of division to said Ocean; thence east along said Ocean three hundred (300) feet more or less to the point of beginning."

This was a description of old lot 44, the proposition to purchase which had been submitted to and had been approved by the electors. The Special Term has found as matter of fact that neither in the proposition in writing for the purchase of the lot nor in the notices published in the newspapers and posted pursuant to the statute was any mention made of land under water in Gravesend bay. The Special Term has also found as matter of fact: " No proposition was ever received by the trustees of the common lands of the Town of Gravesend to sell or convey that portion of the premises described in the complaint which lies outshore of the original mean high water line of Gravesend Bay; that no consideration was offered

to be paid or ever was paid therefor; that no notice of any town meeting was ever given for the purpose of having the electors vote upon any proposition to sell or convey any portion of the premises described in the complaint lying outshore of the original mean high water line of Gravesend Bay; that the electors of the town at no time had any opportunity to vote upon, nor did they at any time vote upon any proposition to sell or convey any portion of said lands outshore of said mean high water line."

But, in the deed, the trustees assumed to convey in addition to old lot 44, " Together with all the right, title and interest of the party of the first part [*i. e.*, the town of Gravesend] in and to the water and land under water in Gravesend bay adjacent to the said premises as far as the title of the party of the first part extends, except that navigation shall not be obstructed."

The title of the town to the land under water in the bay extended across the entire width of the bay.

In 1890 Tracey conveyed the premises by bargain and sale deed with the same description to William A. Downing, and on June 1, 1896, Downing conveyed the property to the plaintiff by a quitclaim deed containing the same description.

The trial court has found as matter of fact that between 1892 and 1897 Neptune avenue was actually constructed on the line shown on the Kowalski map of 1885 in front of plaintiff's upland. In *Somerville* v. *City of New York* (78 Misc. Rep. 210) Mr. Justice CRANE says: " Neptune avenue between West Thirty-sixth street and West Sixth street was opened in 1886 pursuant to resolution of the Kings county board of supervisors. Between West Thirty-sixth street and West Twenty-third street, Neptune avenue consisted of land below high water mark in Gravesend bay along the northerly shore of Coney Island. In this proceeding the report of the commissioners filed in the Kings county clerk's office on May 7, 1886, mentions seven of the lots on each side of the newly opened street as owned by the town of Gravesend. Twenty-four deeds in evidence show that since 1891 the town has conveyed away to various individuals the land under water on the northerly shore of the bay, and by leases made in 1852 and in 1862 disposed of a portion of the shore to low water

mark. It will thus be seen that from 1686 until the merger with the city of Brooklyn the town of Gravesend claimed property rights in Gravesend bay and exercised ownership over portions of it. In 1894 by chapter 449 of the laws of that year, the town of Gravesend was annexed to the city of Brooklyn, and by chapter 378 of the Laws of 1897, known as the Greater New York Charter, the city of Brooklyn, including the town of Gravesend, was consolidated with the city of New York."

Old lot 44 lies between West Thirty-first street on the east and West Thirty-second street on the west and is, therefore, within the district covered by the Neptune avenue opening proceedings in 1886, referred to in Mr. Justice CRANE'S opinion. In November, 1885, at the same meeting at which the board of supervisors directed the opening of Neptune avenue, they directed the opening of West Thirty-first street from Canal avenue to Surf avenue and of West Thirty-second street from Canal avenue to the Atlantic ocean. A petition for appointment of commissioners was presented to the court and commissioners were appointed, but it does not appear whether any further proceedings were taken at that time to open these streets. How far, if at all, the actual construction of Neptune avenue, opened in 1886, had proceeded at the date of the deed to plaintiff's predecessor in title, Tracey, in 1890, is not shown on the record here. Indeed the opening proceedings in 1886 and the awards of damages and assessments for benefits are not referred to in any way. On the trial the counsel for the plaintiff and defendant city of New York stipulated, and the trial judge has found as matter of fact, that " Between 1892 and 1897 Neptune Avenue was constructed on the line shown on the Kowalski map of 1885 in front of the plaintiff's upland and inshore of the bulkhead line." No bulkhead line is indicated on either of the Kowalski maps. The Special Term found as matter of fact that on July 11, 1918, the Secretary of War duly approved a pier and bulkhead line shown on a survey in the case. This bulkhead line of 1918, running east and west, is a considerable distance to the north of Canal avenue, the exterior street shown on the Kowalski map of 1885. The court also found that a bulkhead line was established by chapter 763 of the Laws of 1857, " out beyond the

bulkhead line " of 1918. No such line is shown on the maps made in 1878 or 1885.

But however this may be, the plaintiff having received her deed in 1896, it was stipulated by counsel at the trial and found by the court as matter of fact, that " in 1906 the plaintiff contracted to sell the block between Mermaid and Neptune Avenues, West 31st and West 32nd Streets to one Somerville and permitted Somerville to ·enter into possession. While in possession Somerville filled the block to the level of Mermaid and Neptune Avenues, all of said filling being inshore of the bulkhead line. He did not complete his purchase and in the same year plaintiff resumed possession."

So it appears that the land under water between the north line of old lot 44 and Neptune avenue was filled in and made land, not by the town of Gravesend or the city of Brooklyn or the city of New York, but by plaintiff's tenant Somerville. And plaintiff has " resumed possession," not only of old lot 44, but of this filled-in land lying between lot 44 and Neptune avenue, a considerable area extending from West Thirty-first street to West Thirty-second street.

But for some reason not apparent on this record, the city while contesting the plaintiff's right to the land under water north of Neptune avenue, does not question her right to similar land south of Neptune avenue, and the trial court found as matter of fact " that the defendants herein stipulated orally in open Court that there was no dispute in this action as to plaintiff's title south of Neptune avenue."

The learned trial justice decided that the deed from the town of Gravesend to Tracey, plaintiff's predecessor in title, conveyed no property other than described in the proposition submitted to the electors and approved by them under Laws of 1883, chapter 458, amending Laws of 1880, chapter 92, section 3, old lot 44, and that this was bounded on the south by the Atlantic ocean and on the north by Gravesend bay. In other words, he decided that Tracey did not obtain any title to the land under water in the bay. He says in his opinion (113 Misc. Rep. 437) that the proposition approved by the electors was for the purchase of lot 44 and that the deed properly described lot 44 by metes and bounds, the northerly

boundary of the lot being a line running " west along said Bay." That the statute expressly provided that the trustees had no power to sell or give title to any of the town lands, beyond the land mentioned in the proposition and described in the published notices prescribed, " stating plainly and fully the proposition or propositions they have [had] received." And the statute further provided that the ballot by which the electors manifested their decision should contain on one side thereof " a distinct and sufficient designation of the lot by its map number or otherwise." He holds that the notice of the town meeting and the proposition submitted to the voters did not inform them that they were voting upon a proposition to sell land under water. He says: " It is to be presumed that the electors had knowledge of that fact and that upon voting in favor of the proposition to sell they had in mind only the sale of the property shown on the map as lot 44. It may be that they would not have consented to the sale of the land under water, having in mind that it should be kept for the benefit of all the people. At any rate it was the purpose of the statute that notice should be given to the electors of the propositions received by the trustees for the sale or release of the town's property; and an adherence to the terms of the statute was necessary to give title. The trustees, in giving the deed, were mere agents performing an administrative act. The real owners or the principals were the voters of the town. They alone had power to sell the town's land. The trustees might as well have included in the deed any other parcel or strip of land. They had just as much authority to convey any other lot as they had to convey the land under water. The colonial patents show that the town owned all the land under Gravesend bay. It cannot be seriously urged that the land under water included a strip across the bay, yet the deed purports, on its face, to convey all the lands under water adjacent to the upland specifically described. The offer to purchase did not include lands under water and there was no consideration for the transfer of such land."

I think the learned trial justice was right. We are dealing, not with riparian rights, although, as I shall presently indicate, my opinion is that Tracey was not a riparian proprietor. The plaintiff is here asserting title in fee simple to land under

water formerly owned by the town of Gravesend. Not only to the considerable area of land south of Neptune avenue which was filled in by Somerville in 1906, concerning which, for some reason, no question is raised by the parties, but in addition, to a full block of land between Neptune and Canal avenues, 650 feet in length by 300 feet in width, and an additional block of land out beyond Canal avenue to the bulkhead line of 1918.

I do not think the electors of the town of Gravesend in 1890 had the remotest intention of granting such an extensive tract of land to Mr. Tracey in consideration of the $6,500 paid for old lot 44. Indeed the land under water claimed by the plaintiff north of old lot 44 equals if it does not exceed in area the entire lot 44 conveyed to Tracey in 1890. I think the learned justice at Special Term was right in his decision that the plaintiff as the successor in title of Tracey did not acquire any fee title to the land under water below the high-water line shown on the Kowalski map. (*Langdon* v. *Mayor, etc.,* 93 N. Y. 143; *De Lancey* v. *Piepgras,* 138 id. 26; *Sage* v. *Mayor,* 154 id. 61; *People ex rel. Howell* v. *Jessup,* 160 id. 249; *Matter of Mayor, etc.,* 182 id. 361; *Matter of City of New York* [*West Farms Road*], 212 id. 325.)

But the learned trial justice has decided that the plaintiff is a riparian proprietor, that as such proprietor she had the right of access to the water, and the right to land made by accretion, and he says: "These rights were not affected by the opening of Neptune avenue, as the fee title in that street remained in the upland owner. The city acquired only a highway easement in the property." Even though the plaintiff were a riparian owner, I do not understand how the construction of Neptune avenue by the town or the city transferred any fee title to a riparian owner. At the date of the deed from the town of Gravesend to Tracey, in 1890, the town survey commission had laid out Neptune avenue and Canal avenue over the land under water belonging to the town, the map showing the two highways was on file, and Neptune avenue had been legally opened in 1886. Tracey, plaintiff's predecessor in title, purchased lot 44 with notice that Neptune avenue had been laid out and opened between the old high-water mark and the waters of the bay. The exact date when

Second Department, October, 1921.        [Vol. 198

the avenue was constructed is not shown in the record; it is stated that it was between 1892 and 1897. Plaintiff took title in 1896. If she or her predecessors in title had any right of access to the water which was interfered with by the construction of the street, it would seem that they should have asserted their rights and obtained compensation in the opening proceeding, and as matter of fact, award for any damage to lot 44 by reason of opening Neptune avenue had been made to the town which was the owner of the lot, in the opening proceedings. Neither the plaintiff nor her predecessor in title under the deed from the town had title in fee to the land under water. " The right of access and of navigation which the law secures to the riparian owner as one of the incidents of his title to the uplands, does not include any right arising from the use of the land under water or the bed of a tidal river, below high-water mark." (*Hedges* v. *West Shore R. R. Co.,* 150 N. Y. 150.) I can see no warrant for the contention that this right of access to the water, if it existed, was changed into a fee title. Between the high-water line and Neptune avenue the plaintiff's tenant, Somerville, filled in the land under water, the plaintiff is in possession of the made land, and the city is not contesting her right to possession. In *Saunders* v. *N. Y. C. & H. R. R. R. Co.* (144 N. Y. 75) a riparian owner having granted to the railroad company the right to construct its railroad embankment out in the river (although as riparian owner he had no fee title to the land under water), reserved whatever rights he might have to all lands in the river below high-water mark except the strip taken by the railroad, and the railroad agreed to give him a crossing over the embankment so that he might reach the river. The upland owner then filled in the land-locked bay between the roadbed and the upland and asserted title to the land thus made. But the Court of Appeals, reversing the General Term, discussed the doctrine of " accretion " and considered the cases of *Mulry* v. *Norton* (100 N. Y. 424), *Steers* v. *City of Brooklyn* (101 id. 51), and *People ex rel. Blakslee* v. *Commissioners* (135 id. 447), and held that the filled-in land did not belong to plaintiff and that no title could be acquired by the adjacent owner filling in the land under water to which he had no title.

As to the land north of Neptune avenue, between Thirtieth and Thirty-third streets, the Special Term found as matter of fact that it continued to be land under water until the summer of the year 1918, when a contractor working for the United States government filled in the land, so that the block from Neptune avenue to Canal avenue is practically all made land and there is a triangular strip of made land still north of Canal avenue running out to a point 547 feet north of Canal avenue. All of this made land is adjudged to belong to the plaintiff in fee simple upon the theory of " accretion." The learned judge says: " The act of the government in filling in the land under water was without plaintiff's consent and presumably against her will. She has not ratified the act. She has protested, by bringing this action against the occupancy by the city of New York or its licensees of the filled-in land. The city is apparently content with the situation. It has found land formerly under water partly filled in by an agency over which it had no control. It has not protested against that act or demanded compensation for damage, if any, it has suffered. It has ratified, approved and confirmed the act of the government, and has taken possession of the filled-in land and exercised acts of ownership thereof to the great detriment of the plaintiff. The city has a right to proceed against the government for damages caused by the filling in on its land, if any damage has been suffered. Instead of taking that course, it has elected to ratify the act of the government and to utilize the land for its own benefit." (113 Misc. Rep. 442.)

I hardly think we can say that this filling in is an act of the United States government. A government contractor dredging Gravesend bay outside the bulkhead line of 1918, for his own convenience, sees fit to deposit the dredged material on the land under water belonging to the town. No evidence was offered as to who this contractor was, or why he elected to fill in this particular block of land or the reasons or motives for his action. The parties stipulated the fact that he had made the filling. Whether the plaintiff, whose tenant Somerville had done some filling in on his own account south of Neptune avenue, had any right to protest, I doubt, nor can I see how her protest can be made out by the

Second Department, October, 1921.          [Vol. 198·

fact of her bringing this action against · the city, in which she claims title in fee to the land thus wrongfully made, as the court finds. And if the city had a right of action against the government for the wrongful act of the contractor, which may be open to question, and instead of beginning the action sought to utilize its own land thus wrongfully filled in, I am at a loss to understand how this transfers the title in fee from the city to the plaintiff. The learned justice cited, and the plaintiff relies, upon the case of *Steers* v. *City of Brooklyn* (101 N. Y. 51) to sustain the proposition that the land filled in by the government contractor must be regarded as " accretion " to plaintiff's upland on the south side of Neptune avenue. But the Court of Appeals said in *Saunders* v. *N. Y. C. & H. R. R. R. Co.* (*supra*, 83): " The general rule is that, in order to give a littoral proprietor title to land by accretion, the increase must be by such imperceptible degrees that, although persons are able to perceive from time to time that the land has increased on the water line, they could not perceive the progress of the accumulation at the time it was made. (*Mulry* v. *Norton*, 100 N. Y. 424.) The filling up of the bay by cutting down the banks and bluffs above the shore certainly did not give title by accretion within this rule. The case of *Steers* v. *City of Brooklyn* (101 N. Y. 51) does not, I think, sustain the plaintiffs' contention. When the opinion in that case is examined in connection with the facts in the record and with the statutes under which the plaintiff claimed, it will be seen that the defendant simply built a pier upon lands, the title to which was in the plaintiff, and the decision was to the effect that the pier thus built became the property of the plaintiff upon whose lands it was located. It may be true that when a man builds a structure upon his neighbor's land it becomes attached to and a part of the freehold upon which it stands and inures to the benefit of the owner of the soil in the absence of some agreement, express or implied, to the contrary. But that principle has no application to this case, for the reason that here no one filled up any land to which the plaintiffs or any of their grantors had title, and the plaintiffs' grantors could not acquire title by filling up lands under water that belonged to the State. The plaintiffs' contention in this respect is

answered by the remarks of EARL, Ch. J., in the case of the *People ex rel. Blakslee* v. *Commissioners of the Land Office* (135 N. Y. 447) where, after discussing some other claims of the relator, he says: ' But he seems to place some reliance upon other facts. A few years before the grant to the company, he, being president of the company, caused the refuse from its foundries to be deposited in the water west of the railroad, upon some of the land under water subsequently granted to the company, and by this deposit the land was raised above the water. He certainly acquired no title to the land by thus entering upon it without any right and filling it up, and he did not thus become the proprietor of the ' adjacent lands ' within the meaning of the statute above quoted. As between him and the State, it still legally remained land ' under water,' to be dealt with as such.' There is not, I think, any authority in this State to sustain the proposition that an adjacent owner can acquire title to lands under the waters of the Hudson river below high-water mark by filling it up, and the contention certainly has no foundation in reason or justice. No rights vested in the upland owner in virtue of these acts that he did not possess before."

I do not find anything inconsistent with these principles in *Bardes* v. *Herman* (62 Misc. Rep. 428; affd., 144 App. Div. 772; 207 N. Y. 745) or in *Moenig* v. *New York Central R. R. Co.* (187 App. Div. 323; affd., on opinion of BLACKMAR, J., 231 N. Y. 596). In these and similar cases the upland owner had obtained a grant of the land under water from the State, and the decisions hold that on the moving out of a bulkhead line or the lawful construction of a railroad embankment the upland owner by virtue of his grant of the title to the fee of the land under water may acquire the full title and may fill in out to the new line. These decisions in my opinion do not help the plaintiff, who had no title to the land under the water of Gravesend bay.

Judge EARL said in *Langdon* v. *Mayor, etc. (supra,* 144): "A grant of land by the sovereign, bounded by tide water, limits the land conveyed to high-water mark, and gives the grantee no private or exclusive rights whatever below that. * * * In such case the grant is exclusively a conveyance of dry land." If, despite the fact that the deed from the town to

Tracey conveyed no land under water, and despite the fact that at the date of the deed Neptune avenue had been legally opened between the upland and the bay, the plaintiff still had riparian rights, her remedy at most was by action to recover damages for interference with such rights. On no principle, of which I am aware, upon the facts in the record before us can the fee in the land under water belonging to the town or to the city, be transferred to the plaintiff.

When Neptune avenue was constructed over land belonging to the town of Gravesend and to its successor, the city, in pursuance of the plan of the town survey commission adopted and indicated upon the second Kowalski map on file before the deed to Tracey, the plaintiff did not assert any right to have lot 44 " washed by the tide." On the contrary, through her tenant Somerville she filled in the space between her land and the avenue, about half a block in area, and when Somerville went out she " resumed possession " and asserted a property right in the made land with a frontage of 300 feet on the avenue, and a like frontage on each of the side streets. It would seem that this was inconsistent with any claim that she was entitled to have her lot bounded upon the bay. And as the city did not disturb her in her possession thus " resumed," she now seeks to take advantage of the unexplained vagaries of some government contractor who has filled in an additional block of the city's land 650 feet by 300 feet, or more, without leave or license from the municipality, and the plaintiff asserts that she is the owner in fee of this additional land and her contention has been sustained by the Special Term.

It seems to me that the situation is somewhat similar to that of the plaintiff in *Hedges* v. *West Shore R. R. Co.* (150 N. Y. 150). Judge O'BRIEN, writing for the unanimous court, said (at p. 156): " In order to get a clearer view of the question it may be well to go back to the condition of things that existed before the railroad was built and inquire what the rights of the parties then were and how these rights have been affected by subsequent events. The ownership of the plaintiffs' upland was then in Ward, or his executor, under the will, and the title to the strip of land upon which the railroad structure now stands was in the State, subject to an easement in favor of the then owner of the plaintiffs' lands,

to pass over it upon the water to the navigable channel of
the river and to enjoy such riparian rights as were incidental
to the ownership of the shore and bank of the river. [*Rumsey*
v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Saunders Case*, 144
N. Y. 87.]   There is no question in the case, of course, con-
cerning easements of light and air since it is not claimed that
these rights have been at all affected by the acts of the defend-
ants.   The plaintiffs' case rests entirely upon the proposition
that the defendants have invaded and obstructed the right of
access to the navigable highway.   In the original condition of
things the strip of land under water, where the defendants' rail-
road now is, was affected with two distinct rights and interests
that were liable to conflict with each other, and this litigation
is really the result of such conflict.   It arises largely, we think,
from a misconception, on the part of the riparian owners,
with respect to the nature, character and extent of their
rights.   The riparian owner had nothing but a natural ease-
ment or right of access over this strip of land as an incident
of his ownership of the uplands.   On the other hand, the
sovereign owned the land, subject to such easement, and had
the right to put the land to any use consistent with the
exercise of the easement on the part of the riparian proprietor.
The owner of the banks and shore could not so exercise his
right of passage or access to the channel as to destroy, or
unreasonably interfere with, the right of the sovereign to
put its own land to such use as it thought proper.   Where
two such rights or interests exist, with respect to the same
portion of the earth's surface, each must be exercised and
enjoyed in a reasonable way.   Each right or interest in such
a case is always subject to the qualification that it cannot be
exercised or enjoyed in such a way as to destroy the other.
(*Atkins* v. *Bordman*, 2 Met. 457; *Perley* v. *Chandler*, 6 Mass.
454; *Gerrish* v. *Shattuck*, 132 Mass. 235.)"

And the court said: " The sovereign, that is to say the
State, could have built a railroad upon the strip of land
while it was the owner of it, and the then owner of the plaintiffs'
uplands could not complain, providing he was given suitable
and reasonable means of access to the channel.   *   *   *
The railroad company could have appropriated the easement
upon making compensation, in the exercise of the right of

eminent domain, or so constructed its works as to permit its future enjoyment and exercise in a reasonable and suitable manner. It elected to take the latter course, and, therefore, the structure was placed where it now is under lawful authority. The rights of the State to the land had been acquired in pursuance of law, and the easement of the upland owner had not in any legal sense been disturbed."

Certainly the town had the right to open the public highway for the benefit of all the people over its own land. If any rights of upland owners were invaded they were entitled to compensation. But the town was the upland owner at that time and received an award for land taken, and its adjoining land on either side of the highway was assessed for the benefit derived from the opening. The plaintiff appears to have availed herself of the construction of the avenue to fill in half a block of land and thus obtain a frontage of 300 feet of solid land upon these public highways and apparently the city acquiesces in this operation. To say that she still remains a riparian owner seems to be inconsistent with her own acts.

But I cannot see upon what theory she can convert her alleged easement, if she had any easement, into a fee title to the land outside Neptune avenue. As the court said in the *Hedges Case (supra,* 160): " The judgment, we think, rests upon an erroneous view of the nature and character of the plaintiffs' rights as riparian owners. It virtually treats them as owners of the bed of the river, as well as the uplands, and denies to the defendants the right to use their land without the consent of the owners on the shore, or without in some way extinguishing the easement of access. The principle for which the plaintiffs contend would, when carried to its logical results, be productive of very serious consequences to public interests and private rights based upon the ownership of the bed of the river and the soil under water, below high-water mark. * * * The right of access and of navigation which the law secures to the riparian owner as one of the incidents of his title to the uplands, does not include any right arising from the use of the land under water or the bed of a tidal river, below high-water mark."

So far as the judgment appealed from decrees that the

city of New York is the owner in fee of the land under water outside the present fill, I think it is right and should be affirmed, but in so far as it decrees the plaintiff to be the owner in fee free and clear and in possession of the land north of the original north boundary line of old lot 44 as shown on the Kowalski maps, the judgment should be reversed.

This court reverses the findings of fact made at Special Term as follows:

Finding No. 13, in so far as it finds that the act of the contractor working for the United States government in dredging operations in filling in land under water changed the character of such land.

Finding No. 27, in so far as it finds that the plaintiff *resumed* possession of the land filled in by Somerville south of Neptune avenue.

Conclusion of law III. This court disapproves of and reverses the finding whether it be of fact or law in the second sentence in the finding as to changes in the bulkhead line, but finds as matter of fact that the present bulkhead line is shown on plaintiff's Exhibit 8 and that it was approved by the Secretary of War July 31, 1918.

Conclusion of law IV. This court reverses this conclusion whether it be considered as a finding of fact or conclusion of law so far as it relates to changes in any former bulkhead line.

Conclusions of law X, XI, XII and XIII (subds. 1 and 2). This court reverses these conclusions of law.

This court finds as matter of fact the facts stated in the 16th, 17th, 18th and 19th requests to find presented by the defendant city of New York.

The judgment in so far as it decrees that the city of New York is the owner in fee of the land under water outside the present fill should be affirmed; in so far as it decrees that the plaintiff is the owner in fee, free and clear and in possession of the land north of the original north boundary of old lot 44 as shown on the Kowalski maps, the judgment should be reversed and a new trial granted, with costs to abide the event.

BLACKMAR, P. J., MILLS, RICH and MANNING, JJ., concur.

Judgment in so far as it decrees that the city of New York is the owner in fee of the land under water outside the present fill, affirmed; in so far as it decrees that the plaintiff is the owner in fee, free and clear and in possession of the land north of the original north boundary of old lot 44 as shown on the Kowalski maps, the judgment is reversed and a new trial granted, with costs to abide the event. Settle order upon notice before Mr. Justice KELLY.