HARWAY IMPROVEMENT COMPANY, Appellant, Respondent, *v.* HUGH R. PARTRIDGE, Defendant, Impleaded with THE CITY OF NEW YORK, Respondent, Appellant.

Second Department, November 10, 1922.

Deeds — Colonial patents — construction — Gravesend bay — title to land under water is in city of New York — title not acquired by plaintiff and individual defendant or their predecessors in title — permission by commissioner of docks and ferries to fill in land did not estop city — collecting taxes on filled-in land did not estop city — title to upland in plaintiff — original Lovelace patent admissible and binding — riparian rights not affected by filling in land with permission of commissioner of department of docks and ferries of New York city — city of New York not required to account for rents of buildings erected on made land.

In 1643 Governor Kieft, a Dutch Colonial governor, granted to Anthony Jansen land on Gravesend bay, described by metes and bounds and containing approximately 174 acres, and in the same patent granted certain outpoints, one of which, lying on the southerly side of the main farm, extended along the easterly shore of Gravesend bay to Coney Island creek and consisted of a narrow strip of waste land.  In 1670 the Lovelace patent to the town of Gravesend was made which confirmed the Kieft patent of 1645 to the predecessors of the town of Gravesend, by which the western line of the town of Gravesend ran from the westernmost part of Coney Island to the southernmost part of Anthony Jansen's " old Bowerye," and in 1686 the Dongan patent, which refers to and confirms the preceding Lovelace patent, was made, in which the western boundary of the town was described as running from the westernmost part of Coney Island to the westernmost part of land owned by Johnson and Pennoyer, which land was to the west of Jansen's " old Bowerye."

The predecessors of the plaintiff and the individual defendant acquired title to the upland at the southern extremity of the outpoint bordering on Coney Island creek, and in 1896 obtained a grant of the land under water in front of the upland from the Commissioners of the Land Office, for which they paid the State of New York, and in 1908 permission was given by the commissioner of the department of docks and ferries of New York city to fill in the land under water, but it was provided that the permit did not waive any rights which the city might have or claim to have in the premises in question.  The land under water was filled in and solid ground made by the plaintiff which has been in possession of the filled-in land and has paid taxes to the city of New York thereon, and the city has assumed to grant permission and to rent space for erecting bungalows and other temporary living quarters to third persons on both the filled-in land and the upland.  The city of New York acquires its rights to the land under water as successor in interest of the town of Gravesend.

If the southernmost point of Jansen's " old Bowerye " was the southernmost point of the farm proper, then the western boundary line of the town of Gravesend, which ran from the westernmost part of Coney Island to the southernmost point of the " old Bowerye," ran in a northerly direction and there was included within the grant the principal part of Gravesend bay and the land under water in question in this case, but if the southernmost point of the " old Bowerye "

was the southernmost point of the outpoint or strip of waste land, then the line described in the patents of the town of Gravesend ran from the westernmost point of Coney Island to Coney Island creek, almost due east, and the land in question was not included in the patent to the town of Gravesend.

*Held,* that the westerly line of the town of Gravesend in the Lovelace and Dongan patents extended from the westernmost point of Coney Island to either the westernmost point of the land of Johnson and Pennoyer or to the southernmost point of Jansen's " old Bowerye," the farm proper, and did not extend from the westernmost point of Coney Island to the mouth of Coney Island creek, the southernmost point of the waste land or outpoint, and that, therefore, the title to the land under water in Gravesend bay, which is now in dispute, passed by said patents to the city of New York as successor to the town of Gravesend and was not vested in the State of New York (BLACKMAR, P. J., and JAYCOX, J., dissent, with opinion);

That the letters patent issued by the Commissioners of the Land Office to the predecessors in title of the plaintiff and purporting to grant the land under water did not pass title thereto;

That the act of the commissioner of the department of docks and ferries of the city of New York in granting permission to fill in the land under water did not affect the city's right or title in the land, and the receipt of taxes by the city created no estoppel against the city's right to demand possession of its property.

The plaintiff is the absolute owner of the upland in question.

The Lovelace patent, which was deposited in the town clerk's office of Gravesend and bears the indorsement " Recorder by Order of the Governour. Matthias Nicolls Secr.," but which was only recorded in part in the office of the Secretary of the Province, was admissible in evidence and binding on the parties and vested title to the land under water in the town of Gravesend.

The plaintiff did not abandon its riparian rights on the bay by filling in the land under water in front of its shore in pursuance of the permission of the department of docks and ferries of New York city, though the upland is very small in comparison with the filled-in land. (KELLY, J., dissents, with opinion.)

The city of New York is not liable to account to the plaintiff for the money which it received as rent for bungalow sites on the filled-in or made land. (BLACKMAR, P. J., and JAYCOX, J., dissent, with opinion.)

CROSS-APPEALS by the plaintiff, Harway Improvement Company, and the defendant, The City of New York, from certain portions of an interlocutory judgment of the Supreme Court, entered in the office of the clerk of the county of Kings on the 9th day of December, 1920, upon the decision of the court rendered after a trial at the Kings Special Term.

*William N. Dykman* [*James R. Deering* and *James J. Dunn* with him on the brief], for the plaintiff.

*J. Bleecker Miller, Assistant Corporation Counsel* [*John P. O'Brien, Corporation Counsel,* with him on the brief], for The City of New York.

KELLY, J.:

This is an action in partition commenced on September 29, 1916, the complaint alleging that the plaintiff Harway Improve-

ment Company and the defendant Hugh R. Partridge are seized in fee as tenants in common of certain property abutting on Gravesend bay and Coney Island creek or the Gravesend ship canal, plaintiff alleging that it owns three-fourths of the premises and that defendant Partridge owns the remaining one-fourth part. Plaintiff alleges that the defendant The City of New York claims some interest in the premises the nature and extent of which are unknown to plaintiff, whereas it is alleged that defendant Partridge is the only defendant having any right, title or interest whatsoever. Plaintiff asks judgment that the city of New York has no right, title or interest in the premises and for partition between plaintiff and defendant Partridge. Partridge appeared in the action but served no answer. It is very evident that there is no contest between the plaintiff and Partridge who obtained his one-fourth interest by deed from the plaintiff on September 27, 1916, two days before the action was commenced. Apparently the object of the action is to obtain a decree that the city of New York has no interest in the premises.

The defendant City of New York answered denying that plaintiff and defendant Partridge were the owners of the property and alleging that the former town of Gravesend was seized in fee simple and was in possession of the property described in the complaint under and by virtue of certain instruments, letters patent and conveyances from the governors of the former Dutch colony of New Amsterdam and of the English colony or province of New York; that the town never parted with the title and possession of the premises; that pursuant to chapter 449 of the Laws of 1894 the city of Brooklyn succeeded to the ownership of the town, and that by virtue of chapter 378 of the Laws of 1897 the defendant The City of New York became seized and in possession of the property as the successor of the city of Brooklyn and has ever since remained seized and in possession thereof in fee simple.

The learned trial justice found that the premises described in the complaint consisted of land formerly upland and land under water in Gravesend bay. He decreed that the plaintiff and defendant Partridge were the owners of the upland in the properties alleged in the complaint; that this upland extended to high-water line on Gravesend bay as such high-water line existed in 1894; that the land below such high-water mark was owned by the defendant The City of New York. The predecessors in title of the plaintiff, Martense and others, having in 1896 obtained a grant of the land under water from the Commissioners of the Land Office, for which they paid to the State the sum of $5,036.96, the trial court found as matter of law that the letters patent granted

by the Commissioners of the Land Office were ineffectual to convey any title to the grantees named therein and that they were void and of no effect.    He decided that neither the plaintiff nor defendant Partridge had title to any of the lands outshore of the high-water mark of Gravesend bay.

It appeared from the evidence that in the years 1908 and 1909 the plaintiff built a bulkhead around the tract of land under water described in the letters patent and filled it in.    The tract of land thus filled in included sixty-nine and seventeen one-hundredths acres of land under water fronting the comparatively small piece of upland and marsh land owned by the plaintiff, and extended out into Gravesend bay some 2,000 feet beyond the high-water line.    It appears that prior to the application in 1896 made by plaintiff's predecessors in title to the Commissioners of the Land Office for a grant of land under water, the then owners of the upland made a similar application to the trustees of the common lands of the town of Gravesend, but this application was withdrawn or no action taken thereunder.    The plaintiff on January 4, 1908, applied to Commissioner Bensel, of the department of docks and ferries of the city of New York, for permission to fill in the considerable tract of land under water described in the letters patent from the State, and that official by a letter directed to plaintiff, dated January 28, 1908, assumed to grant to plaintiff permission " to build a temporary sheet pile bulkhead and to fill in in rear of same over the area between Bay 49th street and the Gravesend Ship Canal, in the Borough of Brooklyn, extending from the present line of solid filling to the bulkhead line as modified by the Secretary of War on January 29, 1907.    The work is to be done in accordance with the plans submitted by you and under the direction and supervision of the Engineer in Chief of this Department.    It is understood and agreed and is a condition of this permit that by the granting thereof the City does not waive any rights which it may have or claim to have in and to the premises in question."   Of course Commissioner Bensel, of the department of docks and ferries, had no power to grant away any of the city's water front or to assent to any appropriation of the water front by private individuals or corporations.    It is provided in the Greater New York charter (Laws of 1901, chap. 466, § 71): " The rights of the city in and to its water front, ferries, wharf property, land under water, public landings, wharves, docks, streets, avenues, parks, and all other public places are hereby declared to be inalienable."

Under this assumed grant from the Commissioners of the Land Office, the plaintiff has completely changed the physical conditions

12

at this important point, making some seventy acres of solid land between the original upland and the bay. Plaintiff offered evidence that the cost of the bulkhead and filling was $66,955, and the court so found; also that since such bulkhead construction and filling in the plaintiff and Partridge have been in possession of the filled-in land and that they paid taxes to the city on such land. The receipt of taxes created no estoppel against the city's right to demand possession of its property. (*Consolidated Ice Co.* v. *Mayor*, 166 N. Y. 92, 101.)

The learned trial justice found that the city of New York has not acquired the riparian rights of the upland owners; that such riparian rights were not lost by the construction of the bulkhead and fill referred to; that plaintiff and defendant Partridge as upland owners were the owners of all the riparian rights appurtenant to the upland including the right to build piers from the upland into the bay, and the right of access and egress to and from the upland for commerce or business transacted thereon. He decided that the title of the town of Gravesend and of the city as its successor, to the land under water in the bay, was subject to this right of access and egress in the upland owner, and that " The plaintiff, and the defendant Partridge, are entitled to remove the bulkhead and fill, and to restore the premises to the condition they were in at the time the bulkhead and fill were made, and are entitled to a reasonable time to do this." And in decreeing ownership of the land under water in the city of New York in the interlocutory judgment it is adjudged that such ownership is " Subject to the rights of the public and to the public and private rights of the plaintiff and the defendant Hugh R. Partridge as owners of the upland immediately adjoining and adjacent to the above described land under water."

The learned trial justice found that beginning in 1911 and continuing down to the date of the trial, the commissioner of docks of the city of New York in each year issued permits to various persons for the temporary location of tents and bungalows " upon that portion of the upland described in the complaint lying to the west of Harway Avenue, and charged and collected for and on behalf of the City of New York various sums of money for such permits." The interlocutory judgment decrees that plaintiff and Partridge are entitled in this action to an accounting from the city of all moneys received for or on account of such permits, and to recover such money with interest, and the referee appointed to sell the upland partitioned is directed to take such account, and to report the amount so received by the city to the court and that plaintiff and Partridge may have judgment therefor against the

city. The location of these structures, tents or bungalows is shown on a map in evidence. Most of the structures are below the line of high water in 1894 as found by the court, which would place them on the filled-in ground. Some of them are intersected by said high-water line and there are seven of them on the original upland above the high-water line. The exact location of these structures is of some importance, because as to structures erected under permit from the city on land outside the high-water mark of 1894, land owned by the city as found by the judgment, I can see no authority for requiring the city to account for rentals received. There is no evidence that the bungalows outside the high-water line interfere with the easements of access or egress adjudged to belong to the plaintiff and Partridge. As to any structure above high-water line a different rule would apply.

The plaintiff on January 6, 1921, appealed from the interlocutory judgment and from that part of said judgment which decreed that the city of New York was the owner of the filled-in land outside of the high-water line of 1894 subject to the rights of plaintiff and Partridge as upland owners, and the city of New York on January 11, 1921, served a notice of appeal " from the interlocutory judgment herein, dated the 3d day of December, 1920, and entered and filed in the office of the Clerk of the County of Kings on or about the 9th day of December, 1920, whereby it is among other things, ordered, adjudged and decreed that the matter be referred to Patrick E. Callahan, Esq., of Brooklyn, as Referee, to take and state an account upon such proof as may be offered by any of the parties to this action."

The learned counsel for the city upon the argument and in his points attacks the findings of the court and the judgment so far as they decree that the plaintiff and Partridge are the owners of the original upland. The plaintiff suggests that in its notice of appeal " The City apparently appeals only from that part of the judgment which orders a reference to take an account of the rents collected by the City from bungalow licensees, but the notice of appeal is not clear, and wider scope may be claimed for it," and asserts that on the trial the city did not contest the plaintiff's title to the upland. The corporation counsel contends that the notice of appeal is sufficient to enable him to attack the finding of plaintiff's title to the upland and refers to the findings of the trial justice bearing upon plaintiff's ownership, to which the defendant city duly filed exception, and he insists that he may here question plaintiff's title to the upland.

Let us now examine the questions before us on this appeal.

The plaintiff, appellant, contends that the finding of the trial

judge that the city has title to the land under water, below high-water mark, is erroneous. That the findings that title to the land under water in front of the upland at this point was in the city as successor to the town of Gravesend, and that the letters patent for said land under water issued to plaintiff's predecessors in title were void, are contrary to the evidence and contrary to law. Plaintiff claims that this particular part of Gravesend bay was not included in the colonial patents to the town of Gravesend, and asserts that the upland at this point was not in the town of Gravesend, but in the town of New Utrecht.

The controversy arises from plaintiff's contention respecting the location of the westerly line of the town of Gravesend in the Lovelace patent of 1670, which the plaintiff attacks as " unre-corded," and in the Dongan patent of 1686, which concededly was recorded and which refers to and confirms the preceding Lovelace patent. In the Lovelace patent this line is described as a " lyne stretching from the westermost parte of the said Island unto the Southermost parte of Anthony Iansens old Bowerye;" and " beginning at the mouth of a Creek adjacent to Coney Island and being bounded on the westermost parte thereof wth the Land heretofore apperteyning to Anthony Iohnson and Robert Pennoyer." In the Dongan patent this westerly line is described as " beginning at the Westermost Parte of a Certaine Place Called Cunie Island and from thence bounded to the Westermost Parte of Anthony Johnson and Robert Pennoyer." Whether this westerly line ran from Coney Island to the " Southermost parte of Anthony Iansens old Bowerye " or to the " Westermost Parte of Anthony Johnson and Robert Pennoyer," it is the contention of the city that the line ran in a northerly or northeasterly direction across Gravesend bay. The location of the two lines is shown on a map made by Lefford and Strong in 1788, also on the Terhune map of 1797 prepared pursuant to a concurrent resolution of the Senate and Assembly passed February 18, 1786, and chapter 56 of the Laws of 1800, both maps appearing in the record. Taking either line in these ancient patents and maps as the westerly boundary of the town of Gravesend it will be noted that the premises described in the complaint, both upland and land under water, are to the south and east of the line and so within the limits of the grant.

The plaintiff's contention is that this line did not run northerly or northeasterly across the bay as claimed by the defendant City of New York and as shown upon these ancient maps, but that it ran from the westerly end of Coney Island, practically east or a little north of east so that it took in the mouth of Coney Island creek and the creek itself and asserts that the point on Jansen's

land which it finally reached was the southerly point of a " neck," " outpoint " or sandy spit of land which stretched south or southeasterly from Jansen's farm. Plaintiff claims that this was the " Southermost parte of Anthony Iansens old Bowerye " referred to in the Lovelace patent of 1670. But the " old Bowerye " was granted to Anthony Jansen by the Dutch Colonial Governor Kieft in 1643 by a patent describing the farm by metes and bounds which also contained a grant of a parcel of land known as the " Twelve Morgens." This patent did not convey any land under water in the bay. The " neck " or " outpoint " is not included in the metes and bounds of the " Old Bowerye " as described in the patent unless it can be said to be covered by the reference to " certain outpoints lying on the South side." In the later instruments in plaintiff's chain of title the distinction between the " Old Bowerye " proper and the " neck " or " outpoint " is preserved. Possession and ownership of this sandy neck or spit was the source of continual disputes between the inhabitants of Gravesend and Jansen and his successors. The people of Gravesend appear to have disputed Jansen's title to the neck and the title of Browne, his successor in interest. Jansen conveyed to Stillwell in 1660 and Stillwell to Browne in 1664, by deeds in evidence, the imperfect descriptions in which at this early date do not assist us very much. The dispute related solely to the title to the land. It had nothing to do with the bounds of the town of Gravesend. Neither Jansen nor Browne, his successor in title, asserted any ownership of land under water. It appears that the dispute was finally referred to Governor Lovelace who in 1669 appears to have decided " that the Meadow or valley in Controversy appertaines to neither of the pretenders being formerly esteemed as drowned and waste land though since for their owne Conueniency both have stroue to make use of it. The premises however having beene duely considered, it is thought fitting to qualify both partyes and the Govern<sup>r</sup> and Councill doe order and declare that there shall bee assigned and made over unto *Gravesend* two third part of the meadow or valley in dispute to bee and belong to their Towne for ever. Provided that the said Towne doe with ___·___ dayes after the date hereof make their applicaçon to the Gouern<sup>r</sup> for the renovaçon of their Patent according to the Lawes establisht in this Governm<sup>t</sup> they haveing elapsed their interest by their old patent and the resignaçon of the new. The other third part of the Meadow or valley Shall be and remaine to the use and behoofe of *Francis Browne* his heirs and Assignes but not as of Right belonging to him onely as of grace and fav<sup>r</sup> from the Governo<sup>r</sup>." (N. Y. Col. Docs. vol. 14, pp. 622, 623.) This was followed by a formal

judgment of Governor Lovelace dated August 23, 1669 (Id. p. 626), in which it is stated: " And as to y$^e$ Neck of Land Endorsed upon y$^e$ old Pattent of the said *Francis Browne* & also claymed by y$^e$ said Inhabitants of *Grauesend* as aforesaid I doe thinke fitt since it hath hitherto, or most usually beene injoyed in Comon betweene y$^e$ Towne & that Farme that it Continue so still." It was provided that either the town or Browne might appeal to the next Court of Assizes " where y$^e$ Law is open for them." And accordingly we find in the record a judgment dated November 3, 1669, of the " Court of Assizes of L. I. Land Titles " in the case of " The Inhabits't of Gravesend Pl'ts The Inhabitants at the Turls plantacon als Francis Browne Def'ts " (State Historian's Report, 1896, vol. I, Colonial Series, pp. 356, 358; N. Y. Col. Docs. vol. 14, p. 629), from which it appears that a jury decided the dispute as to the title in favor of Browne, but upon " appeale to y$^e$ Bench " the verdict of the jury was set aside, the court holding " In regard y$^e$ merritts of y$^e$ whole matter have been heard and examyned into both by y$^e$ Late & p$^r$sent Governo$^r$ who have made severall ord$^r$ thereupon w$^{ch}$ appeare very equitable & favourable to both partyes, That what hath beene ordered as to y$^e$ division of eith$^r$ meadowe ground or other Land betweene y$^e$ Plts & Def$^t$ by y$^e$ late or p$^r$sent Governour do stand good." On June 29, 1670, an agreement was entered into between Browne and " Ye inhabitans of Gravesend " in the effort to adjust these differences. (Gravesend Town Records, book 3, p. 83.) This agreement was evidently intended to determine the ownership of the neck of land. Apparently there was no dispute that the neck itself was in the town of Gravesend, because no other town is a party to the agreement. Far from declaring to the contrary, this ancient document reserved to the inhabitants of the town a right of way across the neck to reach the waters of the bay. The agreement, it seems to me, is inconsistent with plaintiff's claim that this neck was part of the town of New Utrecht, a claim which was unheard of until advanced in this litigation. That the neck was assessed in New Utrecht on the assessment rolls of 1675 and 1683 was undoubtedly due to the fact that Jansen's " Old Bowerye " on which he resided was in the town of New Utrecht, and the assessment of this sandy strip was in the town of the owner's residence under the laws then in force. The agreement of 1670 between Browne and the inhabitants of Gravesend distinguishes between the " Bowerye " and the neck of land and meadow land. The neck of land is given to Browne, reserving to the inhabitants of Gravesend " ffree Egress and regress over ye s$^d$ Neck of land and along by ye Waterside or Strannt on the west; with ye Libertie of fishing and fowling or any other Needful Occasion; With-

out any Mollestation by the s<sup>d</sup> ffrancis browne or any Else by his meanes." With this agreement of June 29, 1670, between Browne and the inhabitants of Gravesend before him and with his personal knowledge of the *locus in quo* Governor Lovelace on July 1, 1670, granted the patent to the town of Gravesend in which the westerly line of the town is described as a " lyne stretching from the westermost parte of the said Island [*i. e.*, Coney Island] unto the Southermost parte of Anthony Iansens old Bowerye." Mr. Justice CRANE, now of the Court of Appeals, then a justice of the Supreme Court, said at Special Term in *Somerville* v. *City of New York* (78 Misc. Rep. 203, 207): " After twenty-five years of dispute and litigation the town of Gravesend on July 1, 1670, the year in which it made its settlement with Brown, received from Governor Lovelace a grant not only confirmatory of all that had gone before, but also extending this line of western boundary with such definiteness as to preclude further questionings and, in my judgment, to give the town title to the land under water in Gravesend bay between a line running in a northeasterly direction from the westerly point of Coney Island to the southernmost part of Anthony Jansen's land.  *  *  *  If there was any doubt as to where the creek adjoining Coney Island was there could be no doubt as to the westernmost part of Coney Island; neither was there any uncertainty as to the southernmost part of Jansen's farm and the line stretching between these two definite points. It must have been intended to be a straight line and not one following the curve of the shore. A line given in a deed as running from one monument to another is, in the absence of further description, presumed to be a straight line. *Kingsland* v. *Chittenden*, 6 Lans. 15. Not only the previous difficulty which the town had had in attempting to fix its western boundary, but also the plain language of this grant would show an intent to include the water and the land under water between this straight line thus drawn between these two points and the shore line to the east. The map of 1788 proved in litigation between Albert Voorhis and Albert Terhune shows very clearly how this line was drawn and the westerly boundary of the town as it then existed." This " neck " or " point " and its relation to the main farm is shown very clearly on the Lefford and Strong map of 1788 and on the Terhune map of 1797.

Having in mind the decision of this court in *Nevins* v. *Friedauer* (198 App. Div. 250) where we approved Mr. Justice CRANE's decision at Special Term in *Somerville* v. *City of New York* (78 Misc. Rep. 203) that the title to the land under water in Gravesend bay is vested in the city of New York under the ancient patents, the learned counsel for the plaintiff says that the land under water

involved in the *Nevins* and *Somerville* cases was undoubtedly south of the boundary line which he now contends for, and so was within the town of Gravesend.

It is stated in the plaintiff's points on appeal: " The first claim in modern times under the unrecorded, unregistered Lovelace document was made by the city in 1912 at the trial of the *Somerville* case before Mr. Justice CRANE."

On the contrary, in 1912 Mr. Justice CRANE said in *Somerville* v. *City of New York* (*supra*): " It will thus be seen that from 1686 until the merger with the city of Brooklyn the town of Gravesend claimed property rights in Gravesend bay and exercised ownership over portions of it." And it was said by another justice in 1915 in another case involving the title to lands under water (*Somerville* v. *City of New · York*, 89 Misc. Rep. 188, 190): " and, indeed, I never knew that the town's title to the land under water in Sheepshead Bay and Gravesend Bay was questioned until this litigation with the present plaintiff and his brother Mr. Edward Somerville, in the litigation before Mr. Justice CRANE."

This narrow spit of land certainly has a unique history as a subject of dispute and litigation in this State. We have the original controversy between Browne and the inhabitants of Gravesend in 1670. One hundred and thirty-six years thereafter we find it still in the courts. *Emans* v. *Turnbull* (2 Johns. 313) was an action for trespass for assaulting the plaintiff, tried at the Kings County Circuit in April, 1806, involving the history of the title to this neck of land. The claim of the defendant Turnbull was sustained, and the judgment was confirmed by Chief Justice KENT. It is interesting to note in the report of this ancient case (at p. 316): " It was admitted that the neck was not within the boundaries of the patent to Anthony Jansen, or the patent to Francis Brown, but was within the limits of the patents for Gravesend. * * * From the parol evidence, it appeared that the neck was a strip of poor, sandy ground, uncultivated, but producing wild grass, and capable of maintaining cattle."

I am free to say that the " line " from the west point of Coney Island running parallel to the north shore of the island and excluding all of Gravesend bay from the old patents to the town of Gravesend is presented for the first time in the case at bar. It has never been laid down on any map public or private brought to our attention, and is a radical and somewhat startling change of the boundary of the town of Gravesend, which is one of the oldest towns in the State.

If Governor Lovelace did not intend to run this westerly line to the southern point of the " Bowerye " proper to the point

which has been recognized as the boundary line between the towns
of Gravesend and New Utrecht for more than a century, why did
he use this language? Everything else which plaintiff concedes
to have been within the town of Gravesend has already been
described. It is apparent that if he had meant to draw a line
from Coney Island point to the southerly end of the narrow " neck "
or " outpoint," instead of running the line to " the southermost
parte of Anthony Iansens old Bowerye," he would have used the
words " *at the mouth of a creek adjacent to Coney Island*," because
at the beginning of the patent he had used these words in describing
this identical point. How can it be contended that he referred
to the southerly point of this sandy spit or neck of land as the
" southermost parte of Anthony Iansens old Bowerye," when by
his decision and formal judgment confirmed by the Court of Assizes
in the preceding year he had decided that the meadow or valley
in controversy " appertaines to neither of the pretenders being
formerly esteemed as drowned and waste land though since for
their owne Conueniency both have stroue to make use of it," and
he had decided as to this identical neck of land, " And as to
yᵉ Neck of Land Endorsed upon yᵉ old Pattent of the said *Francis
Browne* & also claymed by yᵉ said Inhabitants of *Grauesend* as
aforesaid I doe thinke fitt since it hath hitherto, or most usually
beene injoyed in Comon between yᵉ Towne & that Farme that
it Continue so still." (N. Y. Col. Docs. vol. 14, pp. 623, 626.)

The plaintiff, appellant, argues that the Lovelace patent to
Gravesend as recorded in the office of the Secretary of the Province
does not grant the land under water in Gravesend bay. There is
some question whether the " Duke's Laws," cited by appellant as
requiring the record of patents, applied to the Lovelace patent.
But the *record* in the office of the Secretary is on its face incomplete.
It is merely an abstract of the original document. The original
patent, which is the complete instrument executed in 1670, was
produced from the office of the commissioner of records, to which
it had been transmitted by the town clerk of Gravesend upon
consolidation. The claim advanced by plaintiff, that this original
patent (conceded by plaintiff to be genuine) is not admissible or
binding because it was not *recorded* in the Secretary's office, seems
to me to be rather strained. It was deposited in the town clerk's
office of Gravesend for 200 years. It bears the indorsement,
" Recorder [*sic*] by Order of the Governour. Matthias Nicolls
Secr." (Nicolls was the Secretary of the Province of New York.)
It is sealed with the seal of the Province of New York. If in 1670
the clerk in the office of the Secretary in New York, charged with
the duty of recording the patent, omitted any portion or saw fit to

Second Department, November, 1922.          [Vol. 203

record only an abstract of the document, I cannot see how it affected the rights of the town.  But the most important fact is that it is referred to in the Dongan patent of 1686, which Dongan patent concededly was recorded, where, after reciting the old metes and bounds of the grant to the town of Gravesend, Governor Dongan concludes:  " as According to Severall Indian Deeds Agreements Writeings and the Pattent from Governor Francis Lovelace Dated in the Yeare of our Lord one thousand Six hundred and Seventy may more fully and at Large Appeare."  I think Mr. Justice CRANE was right in his opinion in the *Somerville Case* (*supra*, 78 Misc. Rep. 209), where he said:  " The Dongan patent granted to the town of Gravesend in 1684 was but a confirmation of the Lovelace patent."  It is exceedingly difficult, if not impossible, within proper limits of an opinion, to detail the chain of title of the parties and the various facts and circumstances involved in the final conclusions.

The corporation counsel argues that the title of the town of Gravesend to the bed of Gravesend bay is *res adjudicata* under the *Somerville* cases and our decision in *Nevins* v. *Friedauer* (*supra*). He refers to the opinion of this court in the *Nevins Case* (198 App. Div. 250), where we cite the decisions in the *Somerville* cases as authority for holding, " It has been. decided by the Supreme Court at Special Term that the title to the land under water in Gravesend bay was vested in the city of New York under the ancient patents to the town of Gravesend, the predecessor in title of the city.  [Citing cases.]  We agree with the conclusions of the Special Term in the cases cited, that the town of Gravesend was the owner in fee of the lands under water in the bay and that title to such land is now in the city of New York unless conveyed by the town or city."

I think the court was referring to the particular land in controversy in those cases.  The learned counsel who represented Mrs. Nevins did not question the title of the town to the land under water in the bay under the colonial patents.  Nor had we heard of this new line which is asserted here for the first time.

The plaintiff appellant's claim in the case at bar is based upon what I consider a strained argument advanced in this case for the first time.  Plaintiff relies on the patent from Governor Kieft to Jansen in 1643.  This was a grant of 100 morgens of land (200 acres) lying on the bay " over against Conynen Island extending along the shore two hundred and fifty-three rods."  In my opinion this was the main farm or " Old Bowerye " of Jansen clearly shown on the Terhune map of the town of Gravesend of 1797 and on the Lefford and Strong map of 1788.  In addition to the main

farm or " Old Bowerye " Governor Kieft in the same patent granted to Jansen " certain outpoints lying on the South side [*i. e.,* south of the main farm] * * * with yet another point extending South of the House." This second " outpoint " was a narrow neck or sandy spit of land extending south from the main farm bounded on the west by Gravesend bay and on the east by a creek, and this creek ran down coming to a point practically at Coney Island creek. In my opinion it is clearly distinguishable from the Old Bowerye farm proper, the southerly point of which has marked the northerly or northwesterly boundary between the towns of Gravesend and New Utrecht ever since the towns were created. The plaintiff's case is based on the contention that the south point of this neck was the northerly or northeasterly termination of the westerly boundary line in the Lovelace and Dongan patents. I think this is a strained and fanciful claim. a. It would exclude practically the whole of Gravesend bay from the Dongan and Lovelace patents. b. It would put the entire " neck " in the town of New Utrecht and that is in fact the claim now advanced (for the first time) by the plaintiff, the claim being that while Coney Island was in the town of Gravesend, down to its westerly point, the patents then ran back east parallel with the north shore of Coney Island creek on the east side of Jansen's " neck," and the westerly line of the town then ran north leaving the " neck " between the town of Gravesend and the bay. c. If this were so, we might well ask why this water was ever called " *Gravesend Bay,*" because according to plaintiff's contention its entire easterly shore was in the town of New Utrecht. d. Every conveyance of the land on this neck in the plaintiff's chain of title down to consolidation with the city of Brooklyn describes the property as located in the town of Gravesend.

But all of this easterly shore of Gravesend bay (including the location of the former " neck ") has always been part of the town of Gravesend, at least as far back as present day memories go. And I regard the " Extract from Burr's Atlas of the State of New York, 1829. Published pursuant to chapter 2, Laws of 1827," * which is printed in the record, as of much significance. For it will be perceived that the boundary line between the town of New Utrecht and the town of Gravesend as then laid out, 1829, reached the shore of the bay at what would practically be the south end of Anthony Jansen's " old Bowerye " as laid out on the Terhune and Lefford and Strong maps. The learned trial justice in the case at bar found as matter of fact that the " southermost parte of Anthony

---

* Second Meeting.— [REP.

Second Department, November, 1922.    [Vol. 203

Jansen's old Bowerye," referred to in the Lovelace patent to the town of Gravesend, is a point on the shore line of Gravesend bay between Bay Thirty-fifth and Bay Thirty-seventh streets, which is some distance to the north of plaintiff's upland at Bay Forty-ninth street. I think it is apparent that there was no exclusion of this narrow neck or strip from the town of Gravesend.

So I am satisfied that the westerly line of the town of Gravesend in the Lovelace and Dongan patents did in fact run from the west end of Coney Island north across Gravesend bay to the shore, and whether it struck the southerly or westerly point of Jansen's farm, the reference was to the main farm or Bowery and not to this " outpoint " or narrow neck indicated as marsh land on the old maps. This location ·of the west line brings the upland and the land under water described in the complaint within the limits of the town of Gravesend, and the title to the land under water within the boundaries was vested in the town and not in the State of New York. (*Tiffany* v. *Town of Oyster Bay,* 209 N. Y. 1.)

This is in accord with Mr. Justice CRANE's decision in *Somerville* v. *City of New York* (*supra*). Counsel for the plaintiff says in his points that Mr. Justice CRANE had not before him the evidence here presented and fell into error, etc., and he says various exhibits in the case at bar were not before Mr. Justice CRANE in the *Somerville* case, specifying them. I have examined these exhibits and I see nothing which should change Mr. Justice CRANE's decision or compel us to differ with him. I think they confirm his findings.

I disagree with certain findings of fact made by the learned trial justice. While I recommend affirmance of the judgment, he granted certain requests out of the sixty requests for findings of fact and thirty for conclusions of law presented by plaintiff, and among other findings of fact he decided in his ninth finding of fact that " The patent of Governor Kieft of December 16, 1645, to the community at Gravesend did not include any of the land appertaining to Anthony Johnson (Jansen) and Robert Pennoyer; " and in the last clause of the tenth finding of fact he found that " Under the above mentioned patents from Governor William Kieft to Jansen, to Pennoyer, and to Gravesend, and under the confirmatory patent of Governor Nicolls to Gravesend, the lands granted to Jansen and Pennoyer were not included within the limits of the town of Gravesend." I think the patent in question did not convey any *title* to the land theretofore granted to Jansen, but as to the neck of land, or " outpoint " south of the Bowery or main farm, I think this was within the limits and confines of the town for governmental purposes. Mr. Justice CRANE said in the *Somerville Case* (*supra*, 78 Misc. Rep. 209): "Although this [the line] extended

the title of the town to the land under water, it could not affect the title to the Jansen farm, but did include this land within the township of Gravesend." The ownership in Jansen of the main farm in the town of New Utrecht or the ownership of the neck by Jansen if he lived in New Utrecht, would not necessarily exclude the jurisdiction of the town of Gravesend for governmental purposes.

I also disagree with finding of fact No. 32 that the description in the Lovelace patent as recorded did not include any lands under the waters of Gravesend bay. I think the finding is misleading. The patent itself was not recorded at length in the office of the Secretary. There was recorded what is concededly an abbreviated abstract of the instrument itself. The original full patent was on file in the office of the town clerk and did include the land under water, and its existence was noted and it was confirmed in the Dongan patent which is duly recorded at length in the Secretary's office. For the purpose of notice, I think the original Lovelace patent was brought to the attention of purchasers and they were bound to ascertain where it was and its contents.

I, therefore, disagree with the fourth conclusion of law, that the town of Gravesend did not take title to " the floor of Gravesend Bay under the Lovelace patent   *   *   *   recorded in the office of the Secretary of State." The patent in question was not recorded *in full* in the office of the Secretary of the Province. Standing alone, the abbreviation of the patent there recorded might not vest title in the land under the waters of the bay in the town of Gravesend. But the original patent on file in the town clerk's office and confirmed in the Dongan patent did vest title to the land under water in the town. I also disagree with the eighteenth conclusion of law which appears to be a conclusion of fact, viz.: " The plaintiff purchased the land under water described in the complaint in good faith, and without notice actual or constructive of any title or claim in or by The City of New York." I think the plaintiff had actual notice of the boundaries of the town of Gravesend as disclosed by the patents, grants and maps and in law should be held to notice that the land under water belonged to the town of Gravesend.

There are other conclusions of law with which I do not agree, but I will consider them in passing upon the defendant city's appeal.

On the appeal of the plaintiff from the judgment that the city as the successor of the town was the owner of the land under water in the bay and that the grant of land under water from the Commissioners of the Land Office to plaintiff's predecessors in title was void, I think the judgment is right and that it should be affirmed with appropriate modifications of the findings in the particulars to which I have referred.

Considering the second appeal before the court, to wit, the city's appeal from the judgment, I have already referred to the indefiniteness of the city's notice of appeal. Considering it as entitling the city to review the judgment awarding the ownership of the upland above the high-water mark in 1894 to the plaintiff, and without attempting here to detail the various contentions of the city and the answer of the plaintiff, appellant, thereto, the learned trial justice has found as matter of fact that the plaintiff and defendant Partridge are the successors in title to the outpoint or neck of land of Anthony Jansen Van Salee, the original patentee of the old Bowerye farm, I am satisfied that the findings and conclusions of the learned trial justice so far as they relate to plaintiff's chain of title and ownership of the upland are sustained by the evidence. I think the plaintiff established title to the upland. Aside from the criticism of the right of the city to raise the question under its notice of appeal, I am somewhat reassured in my conclusion by the fact that I can find no request made to the trial justice by the city to find that title to the upland is in the city.

This brings me to the remaining point involved in the city's appeal. The learned counsel for plaintiff, appellant, says in his points: "The real controversy between the parties concerns the lands formerly under water between the upland and the bulkhead line." I agree with him. Indeed, I am forced to think that this is the controversy which brought about this so-called action in partition. There is no real controversy between the plaintiff and defendant Partridge over the ownership of the upland. Partridge derives his one-fourth interest sought to be partitioned from a deed *from plaintiff*, dated two days before the action was commenced.

And the importance of the real controversy will be perceived when it is remembered that it involves the title to nearly seventy acres of solid land, at a most important point on the water front of the city of New York, where the Gravesend ship canal enters Gravesend bay and thus New York bay. In 1896 plaintiff's predecessors in title (Egolf, Lott *et al.*) paid the State for the land under water $5,036. The learned trial justice found that the plaintiff in 1908 expended in filling in the land $66,955. So that the cash outlay of plaintiff and its predecessors was somewhere in the neighborhood of $75,000. The present market value of this seventy acres of water front in the city of New York is not stated, but it is very great.

The plaintiff claims to own this filled-in land in fee simple. The city contends that the plaintiff has no title to the filled-in land, and that whatever riparian rights it might have had as upland owner on the shore of Gravesend bay have been lost.

The high-water line found by the court ran substantially north and south at a point west of Harway avenue.

The trial judge having found that the plaintiff has filled in this land under water which it did not own, under a permit from the commissioner of docks of the city of New York, and it being stipulated in the " permit," "*It is understood and agreed and is a condition of this permit that by the granting thereof the City does not waive any rights which it may have or claim to have in and to the premises in question,*" the learned trial justice found as conclusions of law:

" 13. The plaintiff and the defendant Partridge, as the owners of the upland described in the complaint, have and are the owners of all the riparian rights of riparian owners incident thereto, including the right to project one or more piers from the said upland to the said Harbor Commissioner's bulkhead line located in front of said upland, and sufficient for access and egress to and from the said upland for any commerce or business that may be transacted upon said upland.

" 14. The riparian rights of the plaintiff as the owner of the upland described in the complaint were not lost by the construction by the plaintiff of the said bulkhead constructed by the plaintiff, and the fill behind it.

." 15. The plaintiff, and the defendant Partridge, are entitled to remove the bulkhead and fill, and to restore the premises to the condition they were in at the time the bulkhead and fill were made, and are entitled to a reasonable time to do this.   *   *   *

" 17. The letters patent of the People of the State of New York to Adrian V. Martense and others, dated January 20, 1896, were and are ineffectual to convey any title to the grantees named therein and are void and of no effect."

The suggestion in conclusion No. 15, that the plaintiff and Partridge are entitled to remove the bulkhead and fill and to restore the premises to the condition they were in at the time the bulkhead and fill were made, and that they are entitled to a reasonable time to do this, is hardly worthy of serious consideration.

Some such permission was granted to Mr. Tiffany in *Tiffany* v. *Town of Oyster Bay* (192 App. Div. 126; mod. and affd., 234 N. Y. 15). But the situation here is entirely different. In that case Tiffany, relying upon a grant from the Commissioners of the Land Office of land under water in Cold Spring harbor, the validity of which had been sustained at Special Term and in this court, filled in a narrow strip between high- and low-water mark, the foreshore. The Court of Appeals having reversed the judgment and determined that the land under water belonged to the town (*Tiffany*

v. *Town of Oyster Bay, supra*), the defeated riparian owner offered at his own expense to remove the fill and restore the foreshore to its original condition. But the town would not allow him to remove the fill and claimed the right to appropriate the made land to use as a park or recreation ground and to erect bathhouses thereon. Thereupon Tiffany sued to enjoin the town from such use as a violation of his right of access to the bay over the foreshore, and we sustained his riparian rights under the facts in that case.

But it seems to me that the facts in the case at bar, and the radical change effected by this enormous fill covering nearly seventy acres between the original shore line of plaintiff's land and the water, presents an entirely different situation.

I do not find any evidence as to the location of the *low-water line* in 1896 when the water grant was applied for. The map on which the grant was made, printed in the record, while indicating mean *high* water line, does not indicate the line of *low* water. Of course it must have been a comparatively narrow strip of foreshore. If we had only to do with that foreshore, I could see how the court might follow the decision in the *Tiffany* case.

In the case at bar, however, we have this vast area filled in. The town survey commission had laid out a highway across Gravesend bay, outside Harway avenue, to wit, Warehouse avenue. The plaintiff has not only made solid ground between Harway and Warehouse avenues, but has continued the fill out into the bay some 1,300 feet beyond Warehouse avenue. In the Court of Appeals Judge POUND said (234 N. Y. 15, 22): " The trial court held, *first*, that plaintiff's rights as riparian owner were terminated by the construction of the fill and by the consequent unity of ownership of foreshore and upland in the town; that the fill belongs to the town as upland by virtue of plaintiff's wrongful act in cutting himself off from access to the water; and *secondly*, that, if plaintiff retains any such rights as owner of the upland, the purposed use of the land by the town does not interfere therewith. The result first contended for may be possible as a naked legal proposition, *i. e.*, plaintiff made upland out of the town's land under water; therefore it retains its character as upland. But justice mitigates and corrects the harshness of strict law and permits plaintiff's natural rights as owner of the upland to be kept alive. * * * When he made the fill, he acted under color of title and by authority of the court and he should not be unduly and unnecessarily prejudiced by the adverse decision of this court in the first litigation between the parties. * * * In equity the union of ownership of dominant and servient riparian rights in the same person does not effect a merger unless such was the intention of the parties

and justice and equity require it." And the court referred to an offer to remove the narrow strip of filling, and says: "Equity may thus permit the parties to do what they have a legal right to agree to do."

I confess that I can see no similarity between the *Tiffany* case and the case at bar. Here the owners of the upland, recognizing the title of the town of Gravesend, applied to the commissioners of common lands for a grant of the land under water. Without any explanation, so far as the record shows, this application is abandoned, and the upland owners applied for the grant to the State of New York which did not own the land under water. Immediately before consolidation they obtained a grant of this enormous area of land, seventy acres of water front in the city of New York, at a point where the Gravesend ship canal enters the harbor, for $5,036. They assert ownership of the fee, but in 1908 applied for a "permit" to fill in the land — not to the city of New York — not to the commissioners of the sinking fund of the city who are vested with control of the real property of the city, but to the commissioner of docks and ferries, an official absolutely without power to divest the municipality of its property rights in the enormously valuable piece of water front property. Such property rights in the city's land under water were declared to be inalienable by the express provisions of section 71 of the Greater New York charter. And having obtained a "permit" with a "condition" that by the granting thereof "the City does not waive any rights which it may have or claim to have in and to the premises in question," they proceed to appropriate this property to their own use. Tiffany was misled, he acted in good faith, he offered to remove the inconsiderable filling and to restore the foreshore. The plaintiff has obliterated the old shore line, it has built on the land under water of the city in front of the upland a tract of filled-in land seventy acres in area. It had before it the map prepared by the town survey commission (constituted by Laws of 1869, chap. 670, as amd. by Laws of 1872, chap. 331, and Laws of 1874, chap. 581) showing a public highway, Warehouse avenue, laid out to be opened across this area. It proceeds to take this land under water of the city to itself for its private use, without regard to the city's rights or to the *jus publicum.* It is not before the court, as was Tiffany, offering to undo the wrong, or to remove the fill if such a thing were practicable. If its filling in was wrongful and a trespass, as has been decreed, it asserts an easement of access over every square foot of the land unlawfully appropriated and the right to construct

wharves and piers not at its upland but on the outer edge of this unlawful fill. I cannot understand how the plaintiff can claim the riparian rights of an upland owner in the land of the city, or how the plaintiff's natural rights " as owner of the upland " can be kept alive. The case presented is, in my opinion, to be decided according to the law. The plaintiff acted deliberately in all that it did. In *Putnam* v. *Ritchie* (6 Paige, 390) Chancellor WALWORTH said: " I have not, however, been able to find any case, either in this country or in England, wherein the Court of Chancery has assumed jurisdiction to give relief to a complainant, who has made improvements upon land the legal title to which was in the defendant, where there has been neither fraud or acquiescence on the part of the latter after he had knowledge of his legal rights. I do not, therefore, feel myself authorized to introduce a new principle into the law of this court, without the sanction of the Legislature, which principle in its application to future cases might be productive of more injury than benefit." The invasion of the property of the city was clearly tortious, the plaintiff was a mere trespasser. (*Thompson* v. *Simpson*, 128 N. Y. 270, 291; *Matter of St. Lawrence & A. R. R. Co.*, 133 id. 270; *Village of St. Johnsville* v. *Smith*, 184 id. 341, 345.) The Court of Appeals has expressly held that the unauthorized filling in of land under water does not constitute the wrongdoer a riparian owner as to the land thus wrongfully filled in (*People ex rel. Blakslee* v. *Commissioners*, 135 N. Y. 447), and that a riparian owner who fills in land under water to which he has no title acquires no ownership or right in the land thus made. (*Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75.) In this action for partition the judgment is that the title to this filled-in land is in the city of New York. The plaintiff in filling in this land belonging to the city had notice that the city did not waive any rights which it had in the premises. This was the *condition* upon which the commissioner of docks assumed to permit the filling in to be done. At that time, as found by the judgment, the city owned the land under water but subject to the right of the upland owner to sail over and navigate the water of Gravesend bay going to and from his upland, and to construct piers from his upland running into the bay.

When the upland owner saw fit to make solid land of seventy acres of this land under water, it seems to me it was in effect a surrender and abandonment of the riparian rights. It was in my opinion inconsistent with the continued existence of the right to construct docks or wharves on his upland. If this were a narrow strip of foreshore, I would say the doctrine of *Tiffany* v. *Town of Oyster Bay* (*supra*) might apply. To burden this great area of

city land with an unrestricted " easement " of access to the original upland or to preserve the right of the upland owner to construct docks on the exterior line of this filled-in ground, seems without justification in law or in equity, from my point of view. I incline to the belief that the upland owner has forfeited his right to have his land " washed by the tide." He has for his own purposes (obviously supposing he was gaining land) destroyed his upland as riparian property. The comparatively narrow strip of upland between Harway avenue and the high-water mark was very little compared to the vast area of the filled-in land. His right to build docks was a right appurtenant to his upland. He cannot without lawful authority make solid filling of seventy acres of land under water in front of his upland and assert the right as a riparian owner to build docks and wharves out into the bay at the outer or water line of such filled-in land.

The *upland* at the point at the present time is occupied by very few buildings outside of the " bungalows " and shacks maintained in the locality under temporary permits from the dock department, the form of which is in evidence. The learned trial justice finds the issuance of these permits, and in the interlocutory judgment orders the city to account for the rent received and to pay it over to the plaintiff, and the judgment so directs.

If the city has attempted to license any bungalows on *plaintiff's upland,* it should certainly account for the rents. But as to bungalows on the filled-in land under water, I can see no justification for the judgment. There is no finding that such licensed bungalows *(on the filled-in land below high-water mark)* interfered with the riparian right of access between the upland and the water (although as heretofore stated I think the plaintiff's right was gone). The Court of Appeals said in *Hedges* v. *West Shore R. R. Co.* (150 N. Y. 150, cited in the opinion in *Nevins* v. *Friedauer, supra*): " On the other hand, the sovereign owned the land, subject to such easement, and had the right to put the land to any use consistent with the exercise of the easement on the part of the riparian proprietor." In the *Tiffany Case (supra)* we denied the right of the town to place bathhouses on the filled-in land, holding that the easement of access was appurtenant to every foot of the high-water line. But in that case the water line and the foreshore were entirely different in character and dimensions from the situation disclosed in the case at bar. Here there is no evidence of the exercise of the riparian right by the upland owner previous to the filling in, and the upland is of such description that it is hard to imagine how the bungalows on the filled-in land interfered with it. If the city opens Warehouse avenue across this filled-in strip

between plaintiff's upland and the bay as shown on the map, I presume that they could acquire and pay for any "easement" interfered with. So far as access from the original upland to the water is concerned, it would be provided by public streets or highways.

I, therefore, recommend that upon plaintiff's appeal the judgment so far as appealed from be affirmed, without costs, and that this court reverse the ninth finding of fact, and the last clause of the tenth finding of fact, made by the trial justice, as contrary to the evidence. That this court should modify the thirty-second finding of fact by adding thereto the following facts found by this court: "The record of the Lovelace patent in the office of the Secretary on its face is not complete but is an abbreviation or abstract of the original patent on file in the office of the Town Clerk of the town of Gravesend, which original patent was referred to in the Dongan patent to the town of Gravesend in the year 1686, recorded in the office of the Secretary. The original Lovelace patent and the Dongan patent included the lands under the waters of Gravesend Bay in front of the upland claimed by the plaintiff in this action." That this court modify the fifty-eighth finding of fact by adding thereto the following facts found by this court: "Subject to the conditions contained in the permit from the Department of Docks and Ferries, dated January 28th, 1908, and set forth in the sixty-seventh finding of fact." That this court modify the sixty-ninth finding of fact by adding thereto the following facts found by this court, "subject to the conditions set forth in the fifty-eighth finding of fact," and reverse the eighteenth so-called conclusion of law that plaintiff purchased its land in good faith and without notice of the title or claim of the city.

Upon the appeal of the defendant the City of New York the judgment in so far as it decrees ownership of the premises formerly upland in the plaintiff and defendant Partridge, should be affirmed, without costs. In so far as the judgment decrees that the plaintiff and defendant Partridge are the owners of the riparian rights in the filled-in land in front of the premises of the plaintiff and defendant Partridge, formerly the upland, the judgment should be reversed upon the law and the facts. That this court should disapprove and reverse the conclusions of law made at the Special Term and numbered 4, 12, 13, 14, 15, 16 and 18, and make the following conclusion of law: "The riparian rights of the plaintiff as the owner of the premises described in the complaint, formerly upland, were lost by the construction by the plaintiff of the bulkhead, and the filling in of the land behind said bulkhead." That this court upon the appeal of the defendant City of New York should modify the

judgment appealed from in so far as the same decrees an accounting for moneys received by the defendant the City of New York for rental or permits for tents or bungalows, and payment of said amount to the plaintiff and defendant Partridge, so as to limit said accounting and decree for payment to moneys received as rental or for permits for tents or bungalows located upon the former upland above the line of high-water mark.

BLACKMAR, P. J.:

Recognizing the difficulties and uncertainties of locating the boundaries of grants over 200 years old, especially when they involve the title to land under water which has never been the subject of exclusive possession, I submit the reasons that lead me to prefer the solution that the land in question was not granted by the Lovelace and Dongan charters below referred to, but passed to the predecessor in title of the plaintiff by the grant of the State of New York.

By an instrument dated and recorded on the 27th of May, 1643, William Kieft, Director-General of the United Netherlands for the New Netherlands, granted to Antony Jansen van Salee " One hundred morgens [200 acres] of land lying on the Bay of North River on Long Island over against Conynen Island extending along the shore two hundred and fifty-three rods, North North west from the shore about North East by East Two hundred and thirty-six rods again along a hill one hundred and twenty-four rods about South South East, South west by west Twenty four rods, Southerly Twenty four rods, further to the shore South west by west one hundred and seventy rods with certain out points lying on the South side; amounting to Eighty seven morgens, forty nine and one half rods with yet another point extending South of the House surrounded on three sides by a valey (marsh) extending South west by west Seventy two rods Ninety rods South east by South being a parallelogram * * * with certain out points containing twelve morgens Five hundred and fifty and one half rods amounting in all to the aforesaid One hundred morgens." Reserving a perpetual yearly rental of 100 Carolus guilders.

It is difficult to plat this patent by its courses and distances; but it is unquestioned that it contained a plot of ground of about eighty-seven morgens or one hundred and seventy-four acres lying along the shore over against Coney Island from about Bay Twentieth to Bay Thirty-fifth streets, as such streets are now; another plot to the south of twelve morgens or twenty-four acres and certain out points stretching to the south. The location of the grant with its out points is essential to locating the subsequent grant to the

town of Gravesend, and determines the title of the party to the action. Two years after the patent was granted to Jansen, and on the 19th of December, 1645, is Governor Kieft's patent to the town of Gravesend. It is in the shape of a grant to Lady Deborah Moody and others or any they shall join in association with them of " a Certaine quantitie or parcell of land, together with all ye havens, harbours, rivers, creekes, woodland, marshes, and all other appurtenances, thereunto belonging, lyeing and being uppon and about ye Weastermost parte of Longe Island, and beginning att ye mouth of a Creeke adjacent to Coneyne Island, and being bounded one ye Weastward parte theerof with ye land appertaining to Anthony Johnsonn and Robert Pennoyre and soe to runn as farre as the westermost part of a Certaine pond in an ould Indian feild one the North side of ye plantation of ye sd. Robert Pennoyre;" the course is then carried to the east and then to the south to the ocean, " and being bounded one the south side with the maine Ocean." The patent is not confined to a grant of land, as was the Jansen patent, but confers on the patentees the political power to erect a body politic which became the town of Gravesend. It will be noted that this patent is not at any point bounded by the bay on the west. The only west boundary given is the " land appertaining to Anthony Johnsonn and Robert Pennoyre," who held a grant lying to the east of the eighty-seven morgen plot conveyed to Jansen. The description in the Gravesend patent begins " att ye mouth of a Creeke adjacent to Coneyne Island." As appears by all the maps, there was then, as there is now, a creek adjacent to Coney Island, called the Coney Island creek, which separates Coney Island from the mainland and which, straightened and deepened, becomes the Gravesend ship canal. Now, there stretched from the eighty-seven morgen grant to Jansen a neck of sandy land to the mouth of Coney Island creek. This land was included in the grant to Jansen. This fact is abundantly established by litigation between the town of Gravesend and Jansen and his successors in 1656, and judgments thereon, and it is so found by the court. The history of the struggle between the town of Gravesend and Jansen over the neck of land is interesting, but the result establishing the title in Jansen is alone important. If we begin with the mouth of Coney Island creek, the Jansen neck of land is the westerly boundary of the Deborah Moody grant, and the line reaches the old Indian pond, the location of which is well known. The peculiar result of this description is that it does not include any of the westerly end of Coney Island, nor is there any boundary line from the ocean to the mouth of Coney Island creek.

On the 11th of June, 1667, the Jansen patent was confirmed to

his grantee, Francis Browne, by Governor Richard Nicolls, and on August 13, 1668, the Gravesend patent was conferred by Governor Nicolls.

On the 29th of June, 1670, a boundary agreement was executed between the town of Gravesend and Francis Browne which provided that Francis Browne should have " all that Neck of land with ye Timber and hearbridge that lies from his house southward being bounded on the one side with ye baye to ye West: and by a Certain Creeck to ye East," etc., giving the inhabitants of Gravesend free egress and regress over the neck of the land and along the waterside.

Up to this time it is apparent that the town of Gravesend did not abut on the bay, but was separated therefrom by the neck of land belonging to Jansen and his grantees. In fact the claim of the city rests on the Lovelace and Dongan patents which I am about to consider.

There appears in the office of the Secretary of State, book 4 of Patents, page 66, the record of an instrument undated and unsigned, which purports to be a confirmation by Governor Lovelace of the Gravesend patent, together with a grant of " all Couney Island." The city, however, produced from the custody of the commissioner of records an unrecorded instrument which the court held to be the original Lovelace patent. It was dated July 1, 1670, within a month after the boundary agreement between Francis Browne and the town of Gravesend. It confirms the Kieft patent of 1645 by the same description, grants all Coney Island and also contains the following words not in the recorded patent: " *including all the land within a lyne stretching from the westermost parte of the said Island unto the Southermost parte of Anthony Iansens old Bowerye, their East bounds being the Strome Kill which comes to the Marsh or fflye of Mathew Gerretstons land aforementioned, As also the meadowe ground and Upland not specified in their former Pattent concerning wch there have beene severall disputes and differences between the Inhabitants of the said Towne and their neighbour Francis Browne the which in parte were issued both by my Predecessor and my selfe but since fully concluded and determyned betweene them by Articles of Agreement, the which Article I doe hereby confirme and allowe.*" It is upon these words in italics that the city rests its claim to the land under water in Gravesend bay. Upon these words also rests the decision in *Somerville* v. *City of New York* (78 Misc. Rep. 203), *Somerville* v. *City of New York* (89 id. 188) and *Nevins* v. *Friedauer* (198 App. Div. 250). They should be carefully considered. The patent begins by confirming the Kieft patent. It cannot be disputed that the

Kieft patent was bounded on the west by the neck of land patented to Jansen in 1645, and then owned by Francis Browne. The articles of agreement of the preceding month between the town of Gravesend and Francis Browne confirmed the neck to Browne, and this agreement is expressly ratified by this patent. This patent in addition included all Coney Island. It grants all the *land* within a line stretching from the westermost point of Coney Island unto the southermost part of Anthony Jansen's old Bowery. What is the southermost part of Anthony Jansen's old Bowery? It has heretofore been held that the word " Bowery " should be applied to the eighty-seven morgens, and did not include the neck to the south granted to Jansen by the Kieft patent as part of the Bowery. The word " Bowery " means farm. It does not appear why a part of the farm, although a neck of waste farm land, should be cut off to find the southermost part thereof. If the line is drawn from the end of Coney Island to the south end of the neck or the mouth of Coney Island creek, then the boundary is complete. It seems to me, notwithstanding the Lefford and Strong map of 1788, and the Terhune map of 1797, that the southermost portion of Jansen's old Bowery is the southermost portion of his land, and that is the mouth of Coney Island creek, so the line ends where the description begins. In the words commonly used in conveyances, it comes to the point or place of beginning. To carry the line to the point of the eighty-seven morgens leaves a hiatus in the description. The description ends half a mile from the place of beginning. It also violates the rule that a grant from the sovereign must be construed against the grantee. Whether this neck of land became politically a part of the town of Gravesend is of no moment. The Lovelace patent was a grant of land; and the problem before us is to determine from information drawn as much as possible from contemporary sources, the bounds of the grant. To my mind the determining consideration is that the original Dutch patent to Gravesend (the Deborah Moody patent) did not reach the bay but was separated by the interposition of the Jansen neck of land; that the Lovelace patent added Coney Island to the grant and then drew a line from the end of Coney Island to connect with the Deborah Moody grant. If this line be a right line, it leaves undisturbed the judgments in the cases of *Somerville* v. *City of New York* and *Nevins* v. *Friedauer,* as the lands affected by these judgments lie south of such a line and would be included within the grant. Whether the line is a right line or follows the in curve of the shore, it is not relevant to the question before us to inquire. In the case last cited the documents were not presented to this court; the question was whether, assuming

that the land under water belonged to the town of Gravesend, it had been competently conveyed to the plaintiff's grantor.

Following the Lovelace patent is the Dongan patent. This was granted in 1686. It recites that there is a town of Gravesend containing a parcel of land " beginning at the Westermost Part of a Certaine Place Called Cunie Island and from thence bounded to the Westermost Parte of Anthony Johnson and Robert Pennoyer and soe from thence bounded by New Utrecht ffence According to Agreement," etc., as according to several Indian deeds, agreements, writings, and the patent from Governor Francis Lovelace, dated A. D. 1670, may more fully and at large appear. The land so described was confirmed and granted to the town of Gravesend. I find nothing in this patent indicating an intent to do more than confirm prior grants. The Lovelace patent enlarged the Kieft grant by adding Coney Island thereto, but the Dongan patent only grants and confirms what it recited as belonging to the town. It will be noted that the line from the westermost part of Coney Island is no longer to the southermost part of Anthony Jansen's old Bowery, but the grant uses the peculiar language " from thence bounded to the Westermost Parte of Anthony Johnson and Robert Pennoyer." Once more in the Lefford and Strong and Terhune maps this line is drawn to the point which is geographically the westermost part of the Jansen Bowery. But this carries the line to land which undoubtedly is far to the north of any line ever claimed to be the boundary of Gravesend. The eighty-seven morgens granted to Jansen belonged and always have belonged to the town of New Utrecht. The recitals in deeds, the assessments for taxes, the inclusion of the owners, Hansen and Joosten, as patentees in the Dongan patent to New Utrecht, which preceded by four months that to Gravesend, abundantly establishes this fact. The line cannot, therefore, be drawn literally to the westermost point of land of Jansen; it satisfies the words if the land is " bounded " to the nearest westerly point of Jansen's land, viz., to the mouth of Coney Island creek. This coincides with the Lovelace patent, it gives a boundary for the town not broken by a gap over intervening land, and construes the patent favorably to the sovereign.

However that may be, I cannot agree with Mr. Justice KELLY that by filling in the land under water, pursuant to the permission of the department of docks, the plaintiff abandoned its riparian rights. Certainly there can be no inference that the owners of the upland intended to expend $67,000 in filling in the land for the purpose of depriving themselves of valuable riparian rights. In *Tiffany* v. *Town of Oyster Bay* (234 N. Y. 15) it was held that the plaintiff by filling in in front of his upland under the mistaken

notion that he owned the land under water, did not lose his riparian rights. In the case at bar, not only did the plaintiff claim title to the land under water by the grant from the State, but the land was filled in by consent of the city. Even if it be held that its title to the land failed because of a prior grant to the town of Gravesend, it acted in good faith, and thus, within the reasoning of the *Tiffany* case, did not lose its riparian rights.

The judgment should be modified so as to adjudge that the filled-in land belongs to plaintiff and defendant Partridge, the twenty-fifth finding of fact reversed, and as modified affirmed, without costs.

*First,* the court is unanimous that plaintiff owned the upland.

*Second,* the court decides that the land under water belongs to the City of New York, as successor to the city of Brooklyn and the town of Gravesend. Opinion by KELLY, J. MANNING and KELBY, JJ., concur; BLACKMAR, P. J., reads in dissent, with whom JAYCOX, J., concurs.

*Third,* the court decides that the act of plaintiff in filling in the land under water, pursuant to the permission of the department of docks, does not affect its riparian rights. Opinion by BLACKMAR, P. J. JAYCOX, MANNING and KELBY, JJ., concur; KELLY, J., reads in dissent.

*Fourth,* the court decides that the judgment should be modified by eliminating the obligation of the city to account for the rents of buildings which stand upon the made land. Opinion by KELLY, J. MANNING and KELBY, JJ., concur; BLACKMAR, P. J., reads in dissent, with whom JAYCOX, J., concurs.

Settle order on notice, modifying judgment and findings in accordance with prevailing opinions.